[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 990 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 991 
Richard M. Scrushy, the defendant in this case, appealed from a partial summary judgment entered in favor of the plaintiff, Wade Tucker. The trial court made the judgment final pursuant to Rule 54(b), Ala. R. Civ. P. As a preliminary matter, Scrushy filed in this Court an emergency motion to stay execution of the judgment against him. This Court ordered execution of the judgment stayed pending further orders of the Court and, in addition, ordered the parties to show cause whether the partial summary judgment is appropriate for certification as a final appealable order pursuant to Rule 54(b). An adverse determination of that issue would eliminate the basis for enforcement of the judgment. After considering the parties' responses to the Court's show-cause order, we conclude that the trial court's Rule 54(b) certification was appropriate, and, accordingly, we vacate the stay of the execution of the judgment and allow the appeal in this case to proceed. We further conclude that the emergency motion to stay execution of the judgment is due to be denied as premature.
 I. Factual Background and Procedural History
Wade Tucker, a shareholder of Health-South Corporation, filed a shareholder's derivative lawsuit on behalf of Health-South against Scrushy, the former chief executive officer for HealthSouth, and numerous other defendants. This case is one of three civil actions filed as a result of alleged fraudulent accounting practices at HealthSouth. The other two civil cases are pending in the United States District Court for the Northern District of Alabama and in the Delaware Chancery Court. In addition, criminal charges were brought against Scrushy in the same federal court. All of the civil cases were stayed during the pendency of the criminal proceedings against Scrushy. After a lengthy trial, Scrushy was acquitted of the criminal charges against him.
Tucker's complaint alleges that Scrushy and others perpetrated an accounting fraud against HealthSouth, resulting in massive financial losses by HealthSouth and ultimately its shareholders. Tucker's complaint alleges claims of insider open-market trading, fraud, breach of fiduciary duty by corporate directors, professional negligence by auditors, aiding and abetting or civil conspiracy by an investment banking firm, and breach of contract. Tucker's complaint also alleges that Scrushy was unjustly enriched when he accepted bonuses as a result of overvalued financial statements that misstated HealthSouth's net income, which, Tucker alleges, was in violation of a contract between HealthSouth *Page 992 
and Scrushy. As to the claim of unjust enrichment, Tucker's complaint alleges, in pertinent part, as follows:
 "34. Beginning in or about January 1997, and continuing into March 2003, defendants Scrushy [and others] knowingly and willfully conspired and agreed with each other, to commit the wrongdoing alleged herein, specifically, to misrepresent and falsely inflate earnings and HealthSouth's true financial condition. Scrushy [and other defendants] engaged in this fraud, misrepresentation and manipulation of income and earnings of HealthSouth to enrich themselves by artificially inflating HealthSouth's publicly reported earnings and earnings per share an[d] by fraudulently enhancing its reported financial condition.
 "35. Since 1999, Scrushy [and other defendants] overstated HealthSouth's earnings by at least $1.4 Billion. This massive overstatement occurred because Scrushy insisted that HealthSouth meet or exceed earnings expectations. When HealthSouth's earnings fell short of estimates, Scrushy directed HealthSouth's accounting personnel . . . to `fix it' by artificially inflating the company's earnings to match Wall Street expectations.
 "36. Scrushy [and other defendants] also created false journal entries to HealthSouth's income statement and balance sheet accounts. . . .
 "37. It was part of the wrongdoing and conspiracy that Scrushy [and other defendants] engaged in an unlawful scheme to inflate artificially Health-South's publicly reported earnings and earnings per share and to falsify reports of HealthSouth's financial condition so that they could reward themselves with bonuses, stock options, and other corporate perks. Scrushy personally benefitted from the scheme to artificially inflate earnings, having sold at least 7, 782, 130 shares of stock since 1999 at prices grossly inflated by the materially misstated financial statements. Scrushy [and other defendants] `earned' tens of millions of dollars in bonuses, stock options, and excessive salary and perks based on the inflated earnings.
 ". . . .
 "118. During each year from 1992 through his departure in March 2003, Scrushy received tens of millions of dollars in compensation from HealthSouth, including, but not limited to, salary, stock options, benefits, bonuses, incentive compensation, and other income from the corporation in the form of loans, benefits, and/or the use of equipment and facilities of HealthSouth.
 "119. The amounts paid by Health-South to Scrushy were grossly excessive, particularly when one considers the value of stock and dividends.
 "120. What is more, incentive compensation to Scrushy [and other defendants] in executive management, is based on HealthSouth's reported financial results. As these results are and were false, Scrushy [and the others] . . . benefitted improperly and were unjustly enriched to the extent they received incentive compensation based on exaggerated revenues and profits.
 ". . . .
 "COUNT VII
 "Unjust Enrichment
 "188. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs 1 through 187 as though fully set out herein.
 "189. As a result of the transactions set out herein, all Individual Defendants [and other defendants] held money which, in equity and good conscience and under law, belongs to HealthSouth. Defendants *Page 993 
have unjustly enriched themselves by breaches of the duty not to engage in self-dealing and interested transactions as pled herein. All such monies in the hands of defendants are due to be repaid to and for the benefit of HealthSouth.
 "190. Wherefore, Plaintiff, for and on behalf of HealthSouth, seeks money damages from the Defendants . . . in an amount to be determined by the trier of fact to compensate HealthSouth for its damage[ ], plus interest, attorneys' fees, costs, and all such other relief at law and equity to which the corporation may be entitled."
(Emphasis added.)
After Scrushy was acquitted of the criminal charges, Tucker moved for a partial summary judgment in this case, seeking only restitution from Scrushy of bonuses he received from 1996 to 2002. The trial court's judgment summarizes the criminal activities affecting HealthSouth for the years 1996-2002 as follows:
 "HealthSouth, as a publicly traded company, is legally required to file accurate, audited and reliable financial information regarding its ongoing business operations. Some of this information is required to be filed on a quarterly basis and other information on an annual basis. Since March 2003 fifteen (15) senior HealthSouth executives have pled guilty to sundry and various criminal acts, including criminal fraud, specifically regarding the accuracy, reliability, falsification and fabrication of the financial information and documentation that HealthSouth was legally required to file during the years 1996 through 2002 inclusive. Included in the fifteen pleading executives are the five (5) chief financial officers who held that position at HealthSouth prior to March 18, 2003. As of this date, the fifteen pleading executives have been sentenced regarding their criminal activities and Defendant Scrushy's trial resulted in an acquittal. It is with this background that the instant matter comes before the Court."
Scrushy served as the Chief Executive Officer ("CEO") and as the Chairman of the Board of Directors of HealthSouth from 1984 until March 2003, except that he was not the CEO from August 27, 2002, to January 6, 2003. He was fired as HealthSouth's CEO on March 19, 2003, the day after the fraudulent activities were revealed, and he also resigned as Chairman of the Board of Directors. Scrushy signed the annual reports for HealthSouth on Forms 10K submitted to the Securities and Exchange Commission for the years 1996 through 2001, filed annual proxies on Forms 14A for the years 1996 through 2002, and ran for reelection as a director on these proxies. In each annual proxy on Form 14A from 1996 through 2002, HealthSouth disclosed the following criteria for the incentive bonuses it paid its executives:
 "Incentive Compensation: In addition to base salary, the [Compensation] Committee recommends to the Board of Directors cash incentive compensation for HealthSouth's executives, based on each executive's success in meeting qualitative and quantitative performance goals on an annual basis. The total incentive bonus pool available for the company's executives and management personnel is capped at the lesser of (a) the amount by which the company's annual net income exceeds the budgeted annual net income established by the Board of Directors and (b) 10% of the company's annual net income. No bonuses are payable unless annual net income exceeds budgeted net income. Individual incentive bonuses are determined on a basis that takes into account each executive's *Page 994 
success in achieving standards of performance, which may or may not be quantitative, established by the Board of Directors and an executive's superiors. Bonus determinations are made on a case-by-case basis, taking into account appropriate quantitative and qualitative factors, and there is no fixed relationship between any particular performance factor and the amount of a given executive's bonus. Historically, incentive compensation has been a major component of HEALTHSOUTH's executive compensation, and the Committee believes that placing executives at risk for such a component has been effective in motivating such executives to achieve such goals."
(Emphasis added.)
HealthSouth executives were eligible for two kinds of incentive bonuses — annual bonuses and monthly target bonuses — during 1996 through 2002. However, according to the incentive compensation disclosure on the Form 14A proxies, no bonuses were to be paid in any year to any executive, including Scrushy, unless they were paid from the bonus pool that was capped at the lesser of 10% of HealthSouth's net income or the extent by which the actual net income exceeded the budgeted net income.
HealthSouth paid both annual and target bonuses to Scrushy for the years 1996, 1997, 2001, and 2002, and only target bonuses to him for the years 1998-2000. The amounts of those bonuses are shown as follows:

Year Annual Bonus Target Bonus Total Bonus
 ____ ____________ ____________ ___________
 2002 $10,000,000 $ 1,200,000 $11,200,000
 2001 $56,500,000 $ 2,400,000 $ 8,900,000
 2000 None $ 2,154,849 $ 2,154,849
 1999 None $ 134,031 $ 134,031
 1998 None $ 1,577,829 $ 1,577,829
 1997 $10,000,000 $ 2,400,000 $12,400,000
 1996 $58,000,000 $ 2.400,000 $10,400,000
 ___________ ___________ ___________
 Total $34,500,000 $12,266,709 $46,766,709

After HealthSouth's financial problems became public, audits were conducted. Those audits revealed that for the year 1996 HealthSouth's actual net income was far less than had been originally reported and that for the years 1997-2002 Health-South had actually lost millions of dollars annually. The reported and actual net income for those years is shown as follows:
Year Reported Net Income Actual Net Income
 ____ ___________________ _________________
 2002 $135,704,000 $(466,824,000)
 2001 $202,387,000 $(191,225,000)
 2000 $278,465,000 $(364,243,000)
 1999 $ 76,517,000 $(326,443,000)
 1998 $ 46,558,000 $(556,482,000)
 1997 $330,608,000 $( 65,432,000)
 1996 $189,864,000 $ 88,360,000

Based upon the actual annual net income for 1996 and the annual losses for the remaining years, Tucker argued in his summary-judgment motion that there was no bonus pool from which executive bonuses could have been paid and, therefore, that Scrushy should refund the bonuses that were wrongfully paid to him. The trial court noted in its judgment that "Scrushy . . . [did] not dispute that the originally filed financial information that HealthSouth filed as required by law was inaccurate, unreliable, false and fabricated. To the contrary, Defendant Scrushy's position is simply that he played no part in and is not responsible for any of the criminal activities that resulted in the falsification and fabrication of said financial statements."
With regard to the bonuses paid to Scrushy in 1996, the trial court held that because HealthSouth earned positive net income in 1996 issues of material fact precluded a summary judgment as to the 1996 bonuses. With regard to the bonuses paid to Scrushy in 1997-2002, however, the trial court concluded as follows:
 "As to all bonuses paid to Defendant Scrushy for the years 1997 through 2002 inclusive, HealthSouth incurred actual losses and no bonus pool existed out of which the bonuses for these years could *Page 995 
properly have been paid to Scrushy. Scrushy was unjustly enriched by these payments to the detriment of Health-South and to allow Scrushy to retain the benefit of these payments would be unconscionable. These payments must be returned and Plaintiff Tucker is entitled to summary judgment for the bonuses paid to Scrushy for the years 1997 through 2002 inclusive."
The trial court entered a total judgment against Scrushy in the amount of $47,828,106, representing the bonuses paid for the years 1997-2002, plus prejudgment interest. The trial court further held that the judgment did not resolve other claims against Scrushy that remained pending, but it certified pursuant to Rule 54(b) that there was no just reason for delay and directed the entry of a final judgment concerning the bonuses for 1997-2002. Scrushy appealed and asked this Court to stay execution of the judgment pending appeal.
We do not address herein the merits of Scrushy's appeal. We decide at this point only the questions whether the trial court properly concluded that this judgment was appropriate for Rule 54(b) certification — i.e., that the action involved more than one claim, that there was a final decision as to one of those claims, and that there was no just reason for delay — and, if the Rule 54(b) certification was proper, whether to stay execution of the judgment.
 II. Standard of Review
Tucker argues that we should determine whether the trial court exceeded its discretion in this case, while Scrushy argues that we should apply a de novo standard of review. One of the difficulties in deciding upon the appropriate standard of review applicable to an order entered pursuant to Rule 54(b) is that an appellate court is not required to answer a single inquiry but, instead, must answer multiple questions. We have not found an Alabama case that resolves the standard-of-review issue here presented. We have, therefore, turned to federal law, upon which our Rules of Civil Procedure were patterned.[1]
In Samaad v. City of Dallas, 940 F.2d 925, 930 (5th Cir.1991), the United States Court of Appeals for the Fifth Circuit stated:
 "We note initially that the proper method for reviewing a rule 54(b) judgment is not well established. The language of the rule lends itself to two distinct challenges to a rule 54(b) judgment predicated upon the existence of multiple claims. First, an appellee seeking dismissal of an appeal could argue that the complaint does not present `more than one claim for relief.' This is a legal question that could be raised sua sponte by a court of appeals concerned that it might not have jurisdiction. The court of appeals would review de novo the district court's finding of separate claims.
 "Second, an appellee could contend that, assuming the complaint presents multiple claims, the district court nonetheless abused its discretion in entering judgment. In such a situation, the court of appeals would consider whether the district court abused its discretion in determining whether `there [was] no just reason for delay.' If the appellee did not challenge the district court's exercise of discretion (as opposed to its finding of multiple claims), the court of appeals could not consider the issue sua *Page 996 sponte, for it would not go to the appellate court's jurisdiction."
(Footnote omitted.) See also Stearns v. ConsolidatedManagement, Inc., 747 F.2d 1105, 1108 (7th Cir.1984), wherein the United States Court of Appeals for the Seventh Circuit stated:
 "There are three prerequisites to a Rule 54(b) certification. First, the action must involve separate claims. Liberty Mutual Insurance Co. v. Wetzel, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976). Second, there must be a final decision as to at least one of these claims. Third, the district court must expressly determine that there is `no just reason for delay.' The existence of the first two criteria is open to our de novo review, but the determination of `just reason for delay' is addressed to the sound discretion of the district court. Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1, 7-8, 100 S.Ct. 1460, 1464-1465, 64 L.Ed.2d 1 (1980); -Sears Roebuck Co. v. Mackey, 351 U.S. 427, 76 S.Ct. 895, 100 L.Ed. 1297 (1956); Local P-171, Amalgamated Meat Cutters and Butcher Workmen of North America v. Thompson Farms Co., 642 F.2d 1065, 1069 (7th Cir.1981)."
We agree with the reasoning expressed by the Fifth Circuit and the Seventh Circuit and will apply different standards of review to the issues presented here. Whether the action involves separate claims and whether there is a final decision as to at least one of the claims are questions of law to which we will apply a de novo standard of review. Whether there was "no just reason for delay" is an inquiry committed to the sound discretion of the trial court, and, as to that issue, we must determine whether the trial court exceeded its discretion.
 III. Analysis Rule 54(b) states, in pertinent part: "When more than one claim for relief is presented in an action, . . . or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. . . ."
Clearly, Tucker's complaint involves multiple claims and multiple parties. "[F]or a Rule 54(b) certification of finality to be effective, it must fully adjudicate at least one
claim or fully dispose of the claims as they relate to at least one party." Haynes v. Alfa Fin. Corp., 730 So.2d 178,181 (Ala. 1999).
We first address the question whether Tucker's unjust-enrichment claim was a separate and distinct claim that was fully adjudicated by the partial summary judgment. InPrecision American Corp. v. Leasing Service Corp.,505 So.2d 380, 381 (Ala. 1987), this Court recognized the difficulty of the question before us.
 "The question before this Court is whether the partial summary judgment LSC received completely disposed of a claim so as to make that judgment final. Rule 54(b) does not authorize the entry of final judgment on part of a single claim. Tolson v. United States, 732 F.2d 998, 999 (D.C. Cir.1984). Neither federal nor state courts have been able to settle on a single test to determine when claims are separate or exactly what constitutes a claim. See, Tolson, 732 F.2d at 1001; Cates v. Bush, 293 Ala. 535, 307 So.2d 6 (1975). However, authorities have stated that `when plaintiff is suing to vindicate one legal right and alleges several elements of damage, only one claim is presented and subdivision (b) [of rule 54] does not apply.' 10 *Page 997 
C. Wright, A. Miller, and M. Kane, Federal Practice and Procedure: Civil 2d, § 2657, at 69-71 (1983); Landry v. G.B.A., 762 F.2d 462, 464 (5th Cir.1985)."
Federal authorities have also recognized that the "separate claim" question is not easily resolved. For example, the Fifth Circuit stated in Samaad:
 "Even if we are able to differentiate nicely between the legal and discretionary aspects of rule 54(b) judgments, a great deal of uncertainty nonetheless remains, for we must consider the unsettled question of what exactly is a `claim for relief.' The most that can be said confidently about this question is that various courts focus upon different things but are reluctant to articulate hard-and-fast tests.
 "Some courts concentrate on the facts underlying the putatively separate claims. For instance, in Jack Walters Sons [v. Morton Bldg.], 737 F.2d [698] at 702 [(7th Cir.1984)], the court sought to define `claim for relief in light of what it deemed to be rule 54(b)'s purpose: `to spare the court of appeals from having to keep relearning the facts of a case on successive appeals.' Accordingly, it held that `if the facts underlying different claims are different, the claims are separate for Rule 54(b) purposes.' Id.
 "Similarly, in Purdy Mobile Homes [v. Champion Home Builders Co.], 594 F.2d [1313] at 1316 [(9th Cir.1979)], the court rejected an argument that there was only one claim because some facts were common to all the theories of recovery. The fact that one claim required proof of facts different from those required to prove another claim rendered it `separate.' Id. See also Gas-A-Car[, Inc. v. American Petrofina, Inc.], 484 F.2d [1102] at 1105 [(10th Cir.1973)]; 6 [James W.] Moore et al., [Moore's Federal Practice], ¶ 54.332 at 54-194 [(2d ed. 1991)].
 "Other courts have rejected this fact-bound test and have focused upon the possibility of separate recoveries under arguably separate claims. They have developed what one commentator has labeled a `legal rights test,' under which common underlying facts do not preclude the existence of similar claims. 6 Moore et al., supra, ¶ 54.33 at 54-196 n. 31 (discussing Tolson [v. United States, 732 F.2d 998 (D.C. Cir.1984)]).
 "Nonetheless, certain points of agreement emerge from the cases. For instance, `[i]t is clear that a claimant who presents a number of alternative legal theories, but whose recovery is limited to only one of them, has only a single claim of relief for purposes of Rule 54(b).' Page [v. Preisser], 585 F.2d [336] at 339 [(8th Cir.1978)] (citing Edney v. Fidelity Guar. Life Ins. Co., 348 F.2d 136, 138 (8th Cir.1965)). Although courts generally agree on these points, they do not fully reveal the contours of the phrase `claim for relief.' And we are reluctant, at least in this case, to rush in where other courts fear to tread. Like them, rather than attempting to formulate a generally applicable definition, we take note of the foregoing `rules of thumb' and decide the case at hand."
940 F.2d at 930-32 (footnotes omitted).[2] The Seventh Circuit employed similar reasoning in Stearns: *Page 998 
 "Unfortunately, there is no clear test to determine when claims are separate for purposes of the rule. Local P-171 [Amalgamated Meat Cutters v. Thompson Farms Co.], 642 F.2d [1065] at 1070 [(7th Cir.1981)]. Nonetheless, we have recognized certain rules of thumb to identify those types of claims that can never be considered separate, and have examined the remainder on a case-by-case basis. The first rule is that `claims cannot be separate unless separate recovery is possible on each. . . . Hence, mere variations of legal theory do not constitute separate claims.' 642 F.2d at 1071. The second is that `claims so closely related that they would fall afoul of the rule against splitting claims if brought separately' may not be considered as separate. Id."
747 F.2d at 1108-09.
The United States Court of Appeals for the Second Circuit enunciated the following test in Rieser v. Baltimore Ohio R.R., 224 F.2d 198, 199 (2d Cir.1955), that the commentators in Federal Practice Procedure find workable: "The ultimate determination of multiplicity of claims must rest in every case on whether the underlying factual bases for recovery state a number of different claims which could have been separately enforced." The commentators then state:
 "A single claimant presents multiple claims for relief under the Second Circuit's formulation when the possible recoveries are more than one in number and not mutually exclusive or, stated another way, when the facts give rise to more than one legal right or cause of action. . . . However, when a claimant presents a number of legal theories, but will be permitted to recover only on one of them, the bases for recovery are mutually exclusive, or simply presented in the alternative, and plaintiff has only a single claim for relief for purposes of Rule 54(b). Similarly, when plaintiff is suing to vindicate one legal right and alleges several elements of damage, only one claim is presented and subdivision (b) does not apply."
10 Charles Alan Wright et al., Federal Practice Procedure § 2657 (3d ed.1998) (footnotes omitted).
In his complaint, Tucker alleges the following claims against Scrushy: breach of fiduciary duty by insider trading; breach of fiduciary duty by false accounting and omissions in public disclosures; interested transactions and waste of corporate assets; misappropriation of corporate assets; unjust enrichment; breach of contract; civil conspiracy; willful violation of the law; intentional, reckless, and innocent misrepresentation and suppression; breach of duty of loyalty and good faith; and fraud, misrepresentation, and the breach of the fiduciary duties of loyalty, care, and disclosure. We conclude that the various claims in the complaint are not all variations on a single theme. Scrushy's alleged breach of duty in accepting bonuses that HealthSouth was not legally obligated to pay is a sufficiently separate breach that is not alleged elsewhere in the complaint. Therefore, the unjust-enrichment claim is a separate claim that will support a Rule 54(b) certification.
No substantial issue appears to be presented with reference to the extent to which the financial statements were incorrect. Scrushy does not argue that any of the revised yearly income gain or loss totals are incorrect. As we have previously *Page 999 
stated, for purposes of the partial summary judgment appealed here, the trial court assumed "that Defendant Scrushy had no actual knowledge of, played no part in and had no active participation in any of the criminal activities that resulted in the falsification and fabrication of the originally filed financial documents that are at issue." The facts presented in support of the unjust-enrichment claim appear at this juncture in the proceedings to be straight-forward[3] — the Form 14A proxies provided that no bonuses would be paid unless HealthSouth's annual net income exceeded its budgeted net income, bonuses were paid based on incorrect financial statements, and it is now known that during the years in question HealthSouth actually had net losses instead of net gains. The facts underlying the unjust-enrichment claim are sufficiently discrete that the claim can be reviewed separately and apart from the other claims in the complaint. The narrow issues surrounding the bonuses paid to Scrushy are not likely to be presented to us again in the event the remainder of this case is appealed to this Court. See 10 Charles Alan Wright et al.,Federal Practice Procedure § 2659: "It is uneconomical for an appellate court to review facts on an appeal following a Rule 54(b) certification that it is likely to be required to consider again when another appeal is brought after the district court renders its decision on the remaining claims or as to the remaining parties."
We now turn to the question whether the trial court exceeded its discretion in concluding that there was no just reason for delay in bringing this interlocutory appeal. Under the facts presented by this case, we cannot say that the trial court exceeded its discretion. Such a discretionary standard of review requires a presumption in favor of the ruling of the trial court, and this Court will not set aside that ruling unless we are convinced that the trial court exceeded the discretion vested in it.
Scrushy points to the claims that he asserts in other actions and proceedings that, he says, give rise to the prospect for a setoff. In Curtiss-Wright Corp. v. General ElectricCo., 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980), the United States Supreme Court construed Rule 54(b), Fed.R.Civ.P., in a setting in which the United States District Court had rejected the existence of potential setoffs as a basis for declining to determine that there was no just reason for delay. The United States Court of Appeals for the Third Circuit revisited the district court's balancing of the equities and reversed the district court's entry of a Rule 54(b) order. The Supreme Court reversed the Court of Appeals, holding, "The mere presence of [nonfrivolous counterclaims], however, does not render a Rule 54(b) certification inappropriate. If it did, Rule 54(b) would lose much of its utility." 446 U.S. at 9,100 S.Ct. 1460. Later, the Court observed:
 "The question in cases such as this is likely to be close, but the task of weighing and balancing the contending factors is peculiarly one for the trial judge, who can explore all the facets of a case. As we have noted, that assessment merits substantial deference on review. Here, the District Court's assessment of the equities between the parties was based on an intimate knowledge of the case *Page 1000 
and is a reasonable one. The District Court having found no other reason justifying delay, we conclude that it did not abuse its discretion in granting petitioner's motion for certification under Rule 54(b)."
446 U.S. at 12-13, 100 S.Ct. 1460 (footnote omitted). Likewise, we are here dealing with extremely complex litigation pending before the trial court and courts in other jurisdictions. We defer to the trial court's superior intimacy as to the equities in this case in the context of its finding as to the absence of any just reason for delay.
 IV. Conclusion A. The Propriety of the Rule 5Jp(b) Certification
This Court concludes, based upon the materials before us at this stage of the proceeding, that the trial court did not err as a matter of law in its determination that the claim alleging unjust enrichment stemming from the payment of bonuses to Scrushy for the years 1997-2002 constitutes a separate claim against Scrushy. Further, we conclude, again based upon the materials before us at this stage of the proceeding, that the trial court did not exceed its discretion in concluding that there was no just reason for delay in the entry of judgment. Having found that the certificate entered by the trial judge pursuant to Rule 54(b) is appropriate, we vacate the stay of execution previously entered to protect the status quo while determining the propriety of the entry of the order pursuant to Rule 54(b).
 B. The Emergency Motion to Stay the Judgment
In view of the propriety of the Rule 54(b) certification, the status of this proceeding reverts to the posture presented at the time Scrushy filed his emergency motion to stay execution of the judgment.
Rule 8, Ala. R.App. P., provides, in pertinent part:
 "The appellant shall not be entitled to a stay of execution of the judgment pending appeal (except as provided in Rule 62(e), Ala. R. Civ. P.) unless the appellant executes bond with good and sufficient sureties, approved by the clerk of the trial court, payable to the appellee (or to the clerk or register if the trial court so directs), with condition, failing the appeal, to satisfy such judgment as the appellate court may render, when the judgment is:
 "(1) For the payment of money only, in an amount equal to . . . 125% [of the amount of the judgment] if the judgment exceeds $10,000.00. . . ."
(Emphasis added.) The default rule is that the prevailing party may immediately execute on the judgment. If the appellant desires a stay, it is his responsibility to post the required bond. This Court has held that "[t]he language utilized in the rule is mandatory; the trial judge is given no discretion in setting the amount of the supersedeas bond." Ex parteSpriggs Enters., Inc., 376 So.2d 1088, 1089 (Ala. 1979).
In Ware v. Timmons, case no. 1030488, in response to a motion to suspend the requirement of Rule 8(a)(1), this Court issued an order in which it recognized a narrow exception to Rule 8. In that case, this Court directed the trial court to accept "the maximum bond obtainable, based on the appellants' entire net worth and available insurance coverage. . . ." TheWare exception is now recorded in the Committee Comments to Rule 8(a) and (b), Adopted January 12, 2005. The Comments note that the modification to the supersedeas bond requirement in Ware was derived from this Court's authority under Rule 2(b), Ala. R.App. P., to suspend *Page 1001 
a rule of procedure for "good cause shown."[4]
In his brief in support of his motion to stay execution of the judgment that he filed with the trial court, Scrushy stated that "[t]hrough counsel, [he] has investigated obtaining a supersedeas bond and cannot do so." As evidence, he presented an affidavit by William S. Dodson, Jr., president of Robinson-Adams Insurance, Inc., a property and casualty insurance agency in Birmingham. Dodson's affidavit states, in pertinent part, as follows:
 "4. After being contacted by . . . counsel for Mr. Scrushy, I have worked to help Mr. Scrushy procure an appeal/supersedeas bond in the amount of $59,300,000 in this case.
 "5. Specifically, I have talked to Safe-co, CNA, St. Paul/Travelers, AIG, Hartford Indemnity Company and Centennial Casualty Company. All of these sureties have declined to offer a bond to Mr. Scrushy.
 "6. I have also talked to Capitol Indemnity Insurance Company and Zurich Insurance Company. Each of these surety companies said that they would not consider issuing the required supersedeas bond unless Mr. Scrushy would fully collateralize the surety's bond obligation by posting an irrevocable evergreen letter of credit in the amount of the bond penalty issued by a bank that was acceptable to the surety company. To date, I have not been informed that Mr. Scrushy can or will obtain an acceptable letter of credit in the required amount to fully collateralize an appeal bond, so no surety has, at this point, been willing to entertain further the issuance of the bond."
This evidence did not show that Scrushy could not obtain a bond, but only that he would first have to obtain a letter of credit. Notably, Scrushy presented no evidence indicatingthat he could not obtain a letter of credit. Dodson's statement that he had "not been informed" that Scrushy could obtain a letter of credit explains the state of his knowledge, but it does not offer any evidence as to Scrushy's ability to do so. In Scrushy's emergency motion to stay execution of the judgment, counsel asserted that "[n]either he [Scrushy] nor any other individual could conceivably come up with $60 million in cash for such a bond." Absent evidence from Scrushy as to his inability to make any arrangements that would satisfy the requirements for posting a supersedeas bond, consideration of the Ware option is premature. We therefore deny the emergency motion to stay execution of the judgment.
STAY ISSUED FEBRUARY 8, 2006, VACATED; EMERGENCY MOTION TO STAY EXECUTION OF THE JUDGMENT DENIED.
NABERS, C.J., and SEE, HARWOOD, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
 Opinion on the Merits
LYONS, Justice.
Richard M. Scrushy, the defendant in this case, appealed from a partial summary judgment entered in favor of the plaintiff, Wade Tucker, concerning bonuses paid by HealthSouth Corporation to Scrushy during the years 1997 through 2002. The trial court made the judgment final pursuant to Rule 54(b), Ala. R. Civ. P. As a preliminary matter, this Court ordered the parties to show cause whether the judgment was appropriate for certification as a final judgment pursuant to Rule 54(b). In addition, *Page 1002 
we ordered execution of the judgment stayed pending further orders of the Court. After considering the parties' responses to this Court's show-cause order, we concluded that the trial court's Rule 54(b) certification was appropriate, and we vacated the stay of the execution of the judgment and allowed the appeal in this case to proceed. See Scrushy v. Tucker,955 So.2d 988, 988-1001 (Ala. 2006) (April 12, 2006, opinion)("Scrushy I"). We now address the merits of the appeal, and we affirm the judgment.
 I. Factual Background and Procedural History
We detailed the factual background and procedural history of this case in Scrushy I:
 "Wade Tucker, a shareholder of HealthSouth Corporation, filed a shareholder's derivative lawsuit on behalf of HealthSouth against Scrushy, the former chief executive officer for Health-South, and numerous other defendants. This case is one of three civil actions filed as a result of alleged fraudulent accounting practices at HealthSouth. The other two civil cases are pending in the United States District Court for the Northern District of Alabama and in the Delaware Chancery Court. In addition, criminal charges were brought against Scrushy in the same federal court. All of the civil cases were stayed during the pendency of the criminal proceedings against Scrushy. After a lengthy trial, Scrushy was acquitted of the criminal charges against him.
 "Tucker's complaint alleges that Scrushy and others perpetrated an accounting fraud against HealthSouth, resulting in massive financial losses by HealthSouth and ultimately its shareholders. Tucker's complaint alleges claims of insider open-market trading, fraud, breach of fiduciary duty by corporate directors, professional negligence by auditors, aiding and abetting or civil conspiracy by an investment banking firm, and breach of contract. Tucker's complaint also alleges that Scrushy was unjustly enriched when he accepted bonuses as a result of overvalued financial statements that misstated HealthSouth's net income, which, Tucker alleges, was in violation of a contract between HealthSouth and Scrushy. As to the claim of unjust enrichment, Tucker's complaint alleges, in pertinent part, as follows:
 "`34. Beginning in or about January 1997, and continuing into March 2003, defendants Scrushy [and others] knowingly and willfully conspired and agreed with each other, to commit the wrongdoing alleged herein, specifically, to misrepresent and falsely inflate earnings and HealthSouth's true financial condition. Scrushy [and other defendants] engaged in this fraud, misrepresentation and manipulation of income and earnings of HealthSouth to enrich themselves by artificially inflating HealthSouth's publicly reported earnings and earnings per share an[d] by fraudulently enhancing its reported financial condition.
 `"35. Since 1999, Scrushy [and other defendants] overstated Health-South's earnings by at least $1.4 Billion. This massive overstatement occurred because Scrushy insisted that HealthSouth meet or exceed earnings expectations. When HealthSouth's earnings fell short of estimates, Scrushy directed HealthSouth's accounting personnel . . . to "fix it" by artificially inflating the company's earnings to match Wall Street expectations.
 "`36. Scrushy [and other defendants] also created false journal entries *Page 1003 
to HealthSouth's income statement and balance sheet accounts. . . .
 "`37. It was part of the wrongdoing and conspiracy that Scrushy [and other defendants] engaged in an unlawful scheme to inflate artificially HealthSouth's publicly reported earnings and earnings per share and to falsify reports of HealthSouth's financial condition so that they could reward themselves with bonuses, stock options, and other corporate perks. Scrushy personally benefitted from the scheme to artificially inflate earnings, having sold at least 7, 782, 130 shares of stock since 1999 at prices grossly inflated by the materially misstated financial statements. Scrushy [and other defendants] "earned" tens of millions of dollars in bonuses, stock options, and excessive salary and perks based on the inflated earnings.
 "`. . . .
 "`118. During each year from 1992 through his departure in March 2003, Scrushy received tens of millions of dollars in compensation from Health-South, including, but not limited to, salary, stock options, benefits, bonuses, incentive compensation, and other income from the corporation in the form of loans, benefits, and/or the use of equipment and facilities of Health-South.
 "`119. The amounts paid by HealthSouth to Scrushy were grossly excessive, particularly when one considers the value of stock and dividends.
 "`120. What is more, incentive compensation to Scrushy [and other defendants] in executive management, is based on HealthSouth's reported financial results. As these results are and were false, Scrushy [and the others] . . . benefitted improperly and were unjustly enriched to the extent they received incentive compensation based on exaggerated revenues and profits.
 "`. . . .
 "`COUNT VII
 "Unjust Enrichment
 "`188. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs 1 through 187 as though fully set out herein.
 "`189. As a result of the transactions set out herein, all Individual Defendants [and other defendants] held money which, in equity and good conscience and under law, belongs to HealthSouth. Defendants have unjustly enriched themselves by breaches of the duty not to engage in self-dealing and interested transactions as pled herein. All such monies in the hands of defendants are due to be repaid to and for the benefit of HealthSouth.
 "`190. Wherefore, Plaintiff, for and on behalf of HealthSouth, seeks money damages from the Defendants . . . in an amount to be determined by the trier of fact to compensate Health-South for its damage[ ], plus interest, attorneys' fees, costs, and all such other relief at law and equity to which the corporation may be entitled.'
"(Emphasis added.)
 "After Scrushy was acquitted of the criminal charges, Tucker moved for a partial summary judgment in this case, seeking only restitution from Scrushy of bonuses he received from 1996 to 2002. The trial court's judgment summarizes the criminal activities affecting Health-South for the years 1996-2002 as follows: *Page 1004 
 "`HealthSouth, as a publicly traded company, is legally required to file accurate, audited and reliable financial information regarding its ongoing business operations. Some of this information is required to be filed on a quarterly basis and other information on an annual basis. Since March 2003 fifteen (15) senior HealthSouth executives have pled guilty to sundry and various criminal acts, including criminal fraud, specifically regarding the accuracy, reliability, falsification and fabrication of the financial information and documentation that HealthSouth was legally required to file during the years 1996 through 2002 inclusive. Included in the fifteen pleading executives are the five (5) chief financial officers who held that position at HealthSouth prior to March 18, 2003. As of this date, the fifteen pleading executives have been sentenced regarding their criminal activities and Defendant Scrushy's trial resulted in an acquittal. It is with this background that the instant matter comes before the Court.'
 "Scrushy served as the Chief Executive Officer ('CEO') and as the Chairman of the Board of Directors of Health-South from 1984 until March 2003, except that he was not the CEO from August 27, 2002, to January 6, 2003. He was fired as HealthSouth's CEO on March 19, 2003, the day after the fraudulent activities were revealed, and he also resigned as Chairman of the Board of Directors. Scrushy signed the annual reports for HealthSouth on Forms 10K submitted to the Securities and Exchange Commission for the years 1996 through 2001, filed annual proxies on Forms 14A for the years 1996 through 2002, and ran for reelection as a director on these proxies. In each annual proxy on Form 14A from 1996 through 2002, HealthSouth disclosed the following criteria for the incentive bonuses it paid its executives:
 "`Incentive Compensation: In addition to base salary, the [Compensation] Committee recommends to the Board of Directors cash incentive compensation for HealthSouth's executives, based on each executive's success in meeting qualitative and quantitative performance goals on an annual basis. The total incentive bonus pool available for the company's executives and management personnel is capped at the lesser of (a) the amount by which the company's annual net income exceeds the budgeted annual net income established by the Board of Directors and (b) 10% of the company's annual net income. No bonuses are payable unless annual net income exceeds budgeted net income. Individual incentive bonuses are determined on a basis that takes into account each executive's success in achieving standards of performance, which may or may not be quantitative, established by the Board of Directors and an executive's superiors. Bonus determinations are made on a case-by-case basis, taking into account appropriate quantitative and qualitative factors, and there is no fixed relationship between any particular performance factor and the amount of a given executive's bonus. Historically, incentive compensation has been a major component of HEALTHSOUTH'S executive compensation, and the Committee believes that placing executives at risk for such a component has been effective in motivating such executives to achieve such goals.'
"(Emphasis added.)
 "HealthSouth executives were eligible for two kinds of incentive bonuses — annual *Page 1005 
bonuses and monthly target bonuses — during 1996 through 2002. However, according to the incentive compensation disclosure on the Form 14A proxies, no bonuses were to be paid in any year to any executive, including Scrushy, unless they were paid from the bonus pool that was capped at the lesser of 10% of HealthSouth's net income or the extent by which the actual net income exceeded the budgeted net income.
 "HealthSouth paid both annual and target bonuses to Scrushy for the years 1996, 1997, 2001, and 2002, and only target bonuses to him for the years 1998-2000. The amounts of those bonuses are shown as follows:

"Year Annual Bonus Target Bonus Total Bonus
 _____ ____________ ____________ ___________
 "2002 $10,000,000 $ 1,200,000 $11,200,000
 "2001 $ 6,500,000 $ 2,400,000 $ 8,900,000
 "2000 None $ 2,154,849 $ 2,154,849
 "1999 None $ 134,031 $ 134,031
 "1998 None $ 1,577,829 $ 1,577,829
 "1997 $10,000,000 $ 2,400,000 $12,400,000
 "1996 $ 8,000,000 $ 2,400,000 $10,400,000
 ___________ ___________ ___________
"Total $34,500,000 $12,266,709 $46,766,709

 "After HealthSouth's financial problems became public, audits were conducted. Those audits revealed that for the year 1996 HealthSouth's actual net income was far less than had been originally reported and that for the years 1997-2002 HealthSouth had actually lost millions of dollars annually. The reported and actual net income for those years is shown as follows:

"Year Reported Net Income Actual Net Income
 "2002 $135,704,000 $(466,824,000)
 "2001 $202,387,000 $(191,225,000)
 "2000 $278,465,000 $(364,243,000)
 "1999 $ 76,517,000 $(326,443,000)
 "1998 $ 46,558,000 $(556,482,000)
 "1997 $330,608,000 $ (65,432,000)
 "1996 $189,864,000 $ 88,360,000

 "Based upon the actual annual net income for 1996 and the annual losses for the remaining years, Tucker argued in his summary-judgment motion that there was no bonus pool from which executive bonuses could have been paid and, therefore, that Scrushy should refund the bonuses that were wrongfully paid to him. The trial court noted in its judgment that `Scrushy . . . [did] not dispute that the originally filed financial information that HealthSouth filed as required by law was inaccurate, unreliable, false and fabricated. To the contrary, Defendant Scrushy's position is simply that he played no part in and is not responsible for any of the criminal activities that resulted in the falsification and fabrication of said financial statements.'
 "With regard to the bonuses paid to Scrushy in 1996, the trial court held that because HealthSouth earned positive net income in 1996 issues of material fact precluded a summary judgment as to the 1996 bonuses. With regard to the bonuses paid to Scrushy in 1997-2002, however, the trial court concluded as follows:
 "`As to all bonuses paid to Defendant Scrushy for the years 1997 through 2002 inclusive, HealthSouth incurred actual losses and no bonus pool existed out of which the bonuses for these years could properly have been paid to Scrushy. Scrushy was unjustly enriched by these payments to the detriment of HealthSouth and to allow Scrushy to retain the benefit of these payments would be unconscionable. These payments must be returned and Plaintiff Tucker is entitled to summary judgment for the bonuses paid to Scrushy for the years 1997 through 2002 inclusive.'
 "The trial court entered a total judgment against Scrushy in the amount of $47,828,106, representing the bonuses paid for the years 1997-2002, plus pre-judgment interest. The trial court further held that the judgment did not resolve other claims against Scrushy *Page 1006 
that remained pending, but it certified pursuant to Rule 54(b) that there was no just reason for delay and directed the entry of a final judgment concerning the bonuses for 1997-2002. Scrushy appealed and asked this Court to stay execution of the judgment pending appeal."
955 So.2d at 991-95. We declined to stay execution of the judgment.
 II. Standard of Review
"The standard by which this Court will review a motion for summary judgment is well established:
 "`The principles of law applicable to a motion for summary judgment are well settled. To grant such a motion, the trial court must determine that the evidence does not create a genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. When the movant makes a prima facie showing that those two conditions are satisfied, the burden shifts to the nonmovant to present "substantial evidence" creating a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98
(Ala. 1989); § 12-21-12(d) [,] Ala. Code 1975. Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871
(Ala. 1989).
 "`In our review of a summary judgment, we apply the same standard as the trial court. Ex parte Lumpkin, 702 So.2d 462, 465 (Ala. 1997). Our review is subject to the caveat that we must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala. 1990).'"
Payton v. Monsanto Co., 801 So.2d 829, 832-33
(Ala. 2001) (quoting Ex parte Alfa Mut. Gen. Ins. Co.,742 So.2d 182, 184 (Ala. 1999)).
In addition, the parties dispute in this case whether Delaware law or Alabama law controls. Because Delaware law and Alabama law are virtually identical concerning unjust enrichment, we need not decide which state's law controls in order to determine whether the trial court properly entered the judgment in Tucker's favor.
 III. Analysis A. Discovery
Scrushy first argues that the trial court erred in entering the judgment because, he says, the summary judgment denied him the opportunity to conduct discovery. He states in his brief that he "was not allowed to seek documents, send interrogatories, or depose witnesses." Tucker notes, however, that Scrushy never requested any discovery. This Court has reviewed the voluminous record in this case, and we find no attempt by Scrushy to propound interrogatories, to request production of documents, or to notice depositions. After Scrushy's criminal trial concluded and Tucker resubmitted his motion for a summary judgment as to the bonuses HealthSouth paid Scrushy, Scrushy did file an affidavit in which he stated that he requested a continuance for discovery purposes, but he provided no detail about the discovery or why that evidence was not available to him as contemplated by Rule 56(f), Ala. R. Civ. P.
 "Some federal cases have, in fact, permitted consideration of whether `ample time and opportunities for discovery *Page 1007 
have already lapsed.' SEC v. Spence Green Chem. Co., 612 F.2d 896, 901 (5th Cir.1980); see also Kozikowski v. Toll Bros., Inc., 354 F.3d 16, 26 (1st Cir.2003) (stating that a court may grant a Rule 56(f) continuance if the party seeking the continuance `demonstrates that it was diligent in pursuing discovery before summary judgment surfaced'); Aviation Specialties, Inc. v. United Technologies Corp., 568 F.2d 1186, 1190 (5th Cir.1978) (stating that the `[p]laintiff must bear the consequences of its decision to proceed with discovery piecemeal' and holding that the district court did not abuse its discretion in failing to grant a continuance when the plaintiff had not initiated any discovery until his action had been on file for six months and after a pretrial conference had been conducted)."
McGhee v. Martin, 892 So.2d 398, 405 (Ala.Civ.App. 2004).
Rule 56(f) allows a party opposing a summary-judgment motion to file an affidavit alerting the trial court that it is presently unable to present "facts essential to justify the party's opposition." The Committee Comments to August 1, 1992, Amendment to Rule 56(c) and Rule 56(f) state that "[s]uch an affidavit should state with specificity why the opposing evidence is not presently available and should state, as specifically as possible, what future actions are contemplated to discover and present the opposing evidence." The disposition of a request made pursuant to Rule 56(f) is discretionary with the trial court. Because Scrushy's affidavit did not meet the specificity requirements of Rule 56(f), we cannot say that the trial court exceeded its discretion in denying Scrushy's request for a continuance before it entered the judgment on the bonus issue. As the Court of Civil Appeals stated in McGhee v. Martin:
 "In addition, it would be prudent for the party moving for the continuance to be certain that the affidavit contained more than vague assertions that more discovery is needed. Our supreme court has indicated that it requires something more than a conclusory affidavit in the typical Rule 56(f) case. See, e.g., Stallworth [v. AmSouth Bank of Alabama], 709 So.2d [458] at 469 [ (Ala. 1997) ] (`[The Rule 56(f) movant's] conclusory affidavit fails even to identify what crucial evidence pertaining to his . . . claim discovery might disclose.')."
892 So.2d at 405.
 B. The Target Bonuses
Scrushy next argues that his employment contract with HealthSouth governed the payment to him of target bonuses, notwithstanding the provision for bonuses in the annual proxy on Form 14A. Scrushy contends that HealthSouth was contractually obligated to pay his annual and monthly target bonuses, and, he says, he is entitled to retain those funds. Scrushy relies on paragraph 5(b) of his employment contract. The employment contract Scrushy executed in 1998 states, in pertinent part:
 "Annual Target Bonus. The Company shall provide the Executive with the opportunity to earn an annual target bonus (the `Annual Target Bonus') equal to at least $2,400,000. The amount of the Annual Target Bonus will be reviewed at least annually by the Compensation Committee for consideration of appropriate merit increases and, once established at a specified amount, the Annual Target Bonus shall not be decreased during the Employment Period. . . . The Annual Target Bonus will be payable in the event that the Company's operations meet the annual performance standard set forth in the Company's business plan, as approved by the Compensation *Page 1008 
Committee in each year of the Employment Period (the `Business Plan'). In the event that the Company's operations meet the monthly performance standard set forth in the Business Plan, an amount equal to one-twelfth (1/12) of the Annual Target Bonus (a `Monthly Target Bonus') shall be payable within five days following the date the Company's internal monthly financial statements have been completed. In the event that any Monthly Target Bonus shall not be paid during the course of such calendar year because the relevant monthly performance standard was not met, such Monthly Target Bonus shall again become available for payment if the Company attains its annual performance standard for such calendar year. In the event that the annual performance standards are not met, Executive shall nevertheless be entitled to retain all amounts theretofore received in respect of any Monthly Target Bonuses paid during the course of such calendar year. . . ."
Scrushy's other employment contracts had similar provisions. Scrushy argues that pursuant to paragraph 5(b) the target bonuses were separate from the annual incentive bonuses available to senior management; he also argues that the target bonuses did not relate to HealthSouth's annual income.
The trial court's order states:
 "6. No bonuses were to be paid for any year to any executive, including Scrushy, except out of the bonus pool that was capped at the lower of (a) 10% of Net Income or (b) the extent to which actual Net Income exceeds budgeted Net Income. HealthSouth required a two-step process, the first to determine the amount available in a bonus pool to be paid to executives (including Scrushy) and the second to make bonus awards from that pool. HealthSouth never disclosed that any bonuses were ever paid to Scrushy outside of the pool.
 ". . . .
 "12. Scrushy had two employment contracts with HealthSouth during the years 1996 through 2002, the first dated April, 1986 and the second dated April 1, 1998. These employment contracts provided to Defendant Scrushy the `opportunity' to earn bonuses on the same basis as other qualifying executives of HealthSouth. This Court specifically finds these employment contracts between Scrushy and HealthSouth did not guarantee the payment of any type bonus to Defendant Scrushy. To the contrary, any bonuses payable to Mr. Scrushy would come out of the same bonus pool as was available to all other qualifying executives and which has been identified in paragraph 5 above [which quotes the Form 14A disclosure]."
(Emphasis in the trial court's order.)
We agree with the trial court's conclusion. Paragraph 5(b) of the employment contract merely provides Scrushy with "theopportunity to earn an annual target bonus." (Emphasis added.) It is clear from the Form 14A disclosure that a "total incentive bonus pool available for the company's executives and management personnel" provided the funds from which all bonuses were to be awarded. That disclosure also contained the following un-equivocal statement: "No bonuses are payable unless annual net income exceeds budgeted net income." Without annual net income, Scrushy could not have had the opportunity to earn the target bonuses that were the subject of paragraph 5(b) of his employment contract. Because Scrushy's employment contract could not have obligated HealthSouth to pay bonuses when the company not only had no *Page 1009 
annual net income, but had, in fact, sustained an annual net loss, the employment contract supplements and does not contradict the provision for bonuses in the annual proxy on Form 14A, and the trial court correctly did not consider the provisions in the employment contract in determining that Scrushy was not entitled to keep the funds.[1]
 C. The 1997 Annual Bonus
Scrushy next argues that the annual bonus of $10 million that he says in his brief to this Court was paid to him in the spring of 1997 related to HealthSouth's performance in 1996, a year for which the company had annual net income. Scrushy stated in his affidavit in opposition to Tucker's summary-judgment motion:
 "8. With the exception of the monthly target bonuses, whenever I received a bonus, I received it in the spring. HealthSouth reported the bonus in the following year's annual proxy filings with the SEC. For example, Health-South reported in its April 1997 proxy statement that I received in 1996 certain bonuses that related to 1995 and prior years."
Scrushy reasons that HealthSouth could not have determined its net income for 1997 until after December 31, 1997; therefore, he argues, the annual bonus paid in the spring of 1997 must have been based on a "look back" at HealthSouth's annual net income for 1996.
In response to Scrushy's argument, Tucker cites the Form 14A disclosure filed with the SEC on April 17, 1998. Contained in that form is a "Summary Compensation Table" reporting annual and long-term compensation for Scrushy and certain other executives of HealthSouth. The form states:
 "The following table sets forth compensation paid or awarded to the Chief Executive Officer and each of the other four most highly compensated executive officers of the Company (the `Named Executive Officers') for all services rendered to the Company and its subsidiaries in 1995, 1996, and 1997."
In a column labeled "BONUS/ANNUAL INCENTIVE AWARD," the Form 14A reports that Scrushy was paid a bonus of $5,000,000 for 1995, $8,000,000 for 1996, and $10,000,000 for 1997. The report to the SEC makes it clear that an annual bonus in the amount of $10,000,000 was paid to Scrushy for 1997, regardless of when it was paid to him. Scrushy's affidavit merely states that he received bonuses other than target bonuses "in the spring" and refers to the proxy filings as dispositive; yet a review of the proxy filings does not substantiate the conclusion he asks us to draw from the affidavit. He does not allege in his affidavit that he received the $10,000,000 bonus in the spring of 1997. Therefore, we conclude that the affidavit creates no genuine issue as to material fact.
 D. Unjust Enrichment
Scrushy next argues that Tucker did not establish the necessary elements to prove unjust enrichment. Specifically, he argues that Tucker did not prove that it would be unconscionable for Scrushy to keep the bonuses he earned from 1997 through 2002 and that the trial court erred in entering the partial summary judgment because, Scrushy says, the judgment did not "balance the equities," did not consider Scrushy's "detrimental reliance," and did *Page 1010 
not account for the absence of any evidence indicating unconscionability. Scrushy contends that he relied to his detriment on the finality of the bonus compensation when he paid taxes on that income, when he made substantial charitable contributions based on that income, and when he otherwise incurred expenses that he cannot now retrieve. In effect, he says, the trial court has ordered him to forfeit those bonuses, and he cites cases from both Alabama and Delaware holding that equity "abhors a forfeiture."[2]
Scrushy also argues that the trial court erred in relying on a Delaware decision in another aspect of the litigation against him, the "buyback decision." See In re HealthSouth Corp.S'holders Litig., 845 A.2d 1096 (Del.Ch. 2003),aff'd, 847 A.2d 1121 (Del. 2004). Scrushy argues in his brief to this Court that the trial court's "heavy reliance" upon the buyback decision was "unwarranted" because, he says, that decision is "internally inconsistent and thus fundamentally flawed because it purports to base its conclusion on Mr. Scrushy's innocence of any wrongdoing, when in reality it is based on Mr. Scrushy's alleged breach of duties as CEO of HealthSouth concerning its reporting of financial information." Because he was under indictment when the buyback decision was rendered, Scrushy says, he could not effectively defend himself and therefore did not tender his employment contract to the court hearing that litigation. Furthermore, he says, the buyback decision involved a single transaction, whereas this case involves six years of what he describes as "contractually-required Target Bonuses, as well as discretionary Annual Bonuses." Because we have already concluded that Scrushy's employment contract is not inconsistent with the provision for bonuses in the annual proxy statement, this argument has no merit.
We further conclude that the trial court's references in its summary-judgment order to the buyback decision were not unwarranted. The trial court stated:
 "The courts of Delaware rescinded a 2002 transaction wherein Scrushy repaid a $25 million loan to HealthSouth with shares of his HealthSouth stock artificially inflated by the same accounting fraud that raged on his watch as CEO. In Re HealthSouth Shareholders Litig., 845 A.2d 1096 (Del.Ch. Nov.2003), aff'd, 847 A.2d 1121 (Del. 2004), . . . rearg. denied (April 30, 2004) (hereinafter the `Buyback Decision'). The Delaware Supreme Court affirmed the Buyback Decision en banc for all the reasons stated in the opinion of the Court of Chancery. The parties contest the effect of the Buyback Decision in these motions. This Court concludes that even if it is not given collateral estoppel effect, the Buyback Decision stands as important precedent as to the law of Delaware regarding unjust enrichment, innocent misrepresentation, and the responsibility of a CEO for his corporation's financial statements when he is enriched by their falsity at the expense of his own corporation."
(Emphasis in the trial court's order.)
The trial court clearly did not give the buyback decision preclusive effect, but instead relied upon it as precedent setting *Page 1011 
forth Delaware law concerning a chief executive officer's responsibility for the financial statements of the officer's corporation. Tucker argues in his brief to this Court that the buyback decision stands for the proposition that "[a] CEO cannot profit at the expense of his corporation from a material fraud in the financial statements prepared on his watch." The buyback decision states: "After all, it was [Scrushy's] managerial responsibility to ensure the filing of accurate statements and he should not, as a fiduciary, benefit at the expense of the object of his trust when his efforts were insufficient." 845 A.2d at 1106.
The Supreme Court of Delaware discussed the theory of unjust enrichment as follows:
 "For a court to order restitution it must first find the defendant was unjustly enriched at the expense of the plaintiff. `Unjust enrichment is defined as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."' [Fleer Corp. v. Topps Chewing Gum, Inc., 539 A.2d 1060, 1062
(Del. 1988) (quoting 66 Am.Jur.2d Restitution and Implied Contracts § 3, p. 945 (1973)).] To obtain restitution, the plaintiffs were required to show that the defendants were unjustly enriched, that the defendants secured a benefit, and that it would be unconscionable to allow them to retain that benefit. [Id. at 1063.] Restitution is permitted even when the defendant retaining the benefit is not a wrongdoer. [Id.]
 "`Restitution serves to "deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses."' [Id. at 1063]."
Schock v. Nash, 732 A.2d 217, 232-33 (Del. 1999) (footnotes omitted; bracketed cites added).
The law in Alabama concerning unjust enrichment is substantially the same:
 "To prevail on a claim of unjust enrichment, the plaintiff must show that the `"defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud."' Dickinson v. Cosmos Broad. Co., 782 So.2d 260, 266 (Ala. 2000) (quoting Hancock-Hazlett Gen. Constr. Co. v. Trane Co., 499 So.2d 1385, 1387
(Ala. 1986)) (some emphasis omitted; some emphasis added). `The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another.' Battles v. Atchison, 545 So.2d 814, 815
(Ala.Civ.App. 1989) (emphasis added).
 "`[T]he remedy of restitution is designed to remedy the detrimental effects caused by unjust enrichment.' Utah Foam Prods., Inc. v. Polytec, Inc., 584 So.2d 1345, 1351 (Ala. 1991). `A claim for restitution is equitable in nature, and permits a trial court to balance the equities and to take into account competing principles to determine if the defendant was unjustly enriched.' United Coastal Indus., Inc. v. Clearheart Constr. Co., 71 Conn.App. 506, 513, 802 A.2d 901, 906
(2002) (emphasis added). Consequently, `"[t]he success of a claim for unjust enrichment depends on the particular facts and circumstances of each case."' DJ Painting, Inc. v. Baraw Enters., Inc., 172 Vt. 239, 245, 776 A.2d 413, 419 (2001) (quoting Morrisville Lumber Co. v. Okcuoglu, 148 Vt. 180, 184, 531 A.2d 887, 889 (1987))." *Page 1012 
Avis Rent A Car Sys., Inc. v. Heilman,876 So.2d 1111, 1122-23 (Ala. 2003).
We conclude that, under the law of either Delaware or Alabama, Scrushy was unjustly enriched by the payment of the bonuses, which were the result of the vast accounting fraud perpetrated upon Health-South and its shareholders, and that equity and good conscience require restitution in the form of repayment of those bonuses. Even though for purposes of the judgment the parties stipulated that Scrushy did not participate in and is not responsible for any of the criminal activities that resulted in the falsification of the financial statements, the trial court noted in its judgment that Scrushy does not dispute that the financial information originally filed by HealthSouth was inaccurate and unreliable. As between Scrushy and Health-South, it would be unconscionable to allow Scrushy to retain millions of dollars awarded to him in the form of bonuses at the expense of the corporation he served as chief executive officer and its shareholders.
 E. Equity
Finally, Scrushy argues that the trial court erred in entering what he describes as an "inequitable order" requiring him to repay funds he never received. He argues that it was inequitable for the trial court to order him to repay the gross amount of the bonuses awarded rather than the net after-tax amount he received. Equitable principles of unjust enrichment, he argues, can require him to repay only the amount he "unjustly" received, and because he never "received" the portion of the bonuses allocated to taxes, he should not be compelled to return that portion of the bonuses.
We find no merit to this argument. Scrushy was credited with the gross amount, and HealthSouth was concomitantly deprived of the amount paid to Scrushy in bonuses, regardless of whether Scrushy paid a certain percentage of those funds in taxes. Whether Scrushy can obtain a refund of the taxes paid upon his restitution of the bonuses is a matter between Scrushy and the taxing authorities.
 IV. Conclusion
We conclude that the trial court properly entered the partial summary judgment as to the bonuses awarded to Scrushy for the years 1997-2002. We therefore affirm that judgment.
AFFIRMED.
NABERS, C.J., and SEE, HARWOOD, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
[1] Federal cases are authoritative in construing the Alabama Rules of Civil Procedure because the Alabama rules were patterned after the federal Rules of Civil Procedure.Borders v. City of Huntsville, 878 So.2d 1168 1176 n. 2 (Ala. 2003).
[2] The Fifth Circuit noted in Samaad that numerous courts have observed the difficulty of this inquiry. See alsoJack Walters Sons v. Morton Bldg., 737 F.2d 698,701-02 (7th Cir.1984); Tolson v. United States,732 F.2d 998, 1001 (D.C. Cir.1984); Local P-171, Amalgamated MeatCutters v. Thompson Farms Co., 642 F.2d 1065, 1070 (7th Cir.1981); Page v. Preiser, 585 F.2d 336, 339 (8th Cir.1978); and Gas-A-Car, Inc. v. American Petrofina,Inc., 484 F.2d 1102, 1104 (10th Cir.1973).
[3] We emphasize that the merits of Scrushy's appeal are not yet before us. We do not here decide whether the trial court's entry of the partial summary judgment on the unjust-enrichment claim was proper. We decide only whether the certification of the judgment as immediately appealable pursuant to Rule 54(b) was proper and, if so, whether to stay execution of the judgment.
[4] The Comments also state that modification of the supersedeas-bond requirement is appropriate "in extraordinary circumstance."
[1] Scrushy also argues that because a valid contract governs the subject matter of bonus compensation, the trial court erred in basing its ruling on the equitable theory of unjust enrichment. Because we conclude that the employment contract does not contain any provision that is inconsistent with the provision in the annual proxy statement preventing the award of bonuses in the absence of net income, this argument has no merit.
[2] Scrushy relies on the affidavit of Dr. Wayne Guay, whom he describes in his brief as "a leading expert on executive compensation." Dr. Guay offered in his affidavit his opinion that many public corporations award bonus compensation even when the corporation's net income is negative. Dr. Guay's opinion, however, does not take into consideration HealthSouth's unequivocal statement in its Form 14A disclosure that "[n]o bonuses are payable unless annual net income exceeds budgeted net income." Other corporations may award bonuses in the face of negative net income, but that was clearly not Health-South's practice.