PER CURIAM.
Wyeth, Inc., and Wyeth Pharmaceuticals, Inc. (hereinafter referred to collectively as “Wyeth”), appeal from a class-certification order of the Jefferson Circuit Court concluding that Blue Cross and Blue Shield of Alabama (“BCBSAL”) met the prerequisites for class certification under Rule 23(a) and 23(b)(3), Ala. R. Civ. P. We vacate the order and remand.

I. Fads and Procedural History

On or about July 15, 1997, Wyeth began distributing Duract, a nonsteroidal, anti-inflammatory drug prescribed for the short-term management of acute pain. The labeling for Duract included an insert provided to physicians, pharmacists, and patients, directing that patients take at most 1 to 2 capsules every 6 to 8 hours and that Duract should be used only for a period of 10 days or less. The Food and Drug Administration (“FDA”) had approved Duract and its labeling before the drug was released into the marketplace.
In December 1997, Wyeth received reports of liver problems, some life-threatening, in patients who had taken Duract for an extended period. In February 1998, Wyeth sought and received FDA approval for a revised package insert for Duract, which described the reports of liver problems resulting from the overuse of the drug and which reemphasized that Duract was intended “only for the short term (10 days or less).”
Following the release of the new package insert, Wyeth continued to receive reports of adverse liver effects for long-term users of Duract. These reports caused Wyeth to conclude that no change in the package insert could guarantee that physicians would stop prescribing Duract for long-term use. Therefore, Wyeth voluntarily withdrew Duract from the market on June 22, 1998, notifying the public of its decision to do so through a press release.
As part of the process of withdrawing Duract from the market, Wyeth voluntarily instituted a customer-refund program for retail customers who still had Duract capsules in their possession. The program provided that Wyeth would reimburse retail customers at the rate of $1.15 per capsule for every Duract capsule returned to Wyeth, with a minimum of a $5.00 refund regardless of the number of pills returned.[1] The reimbursement amount was set at a price above the retail cost of the capsules in order to provide a greater incentive for customers to return the cap *1218 sules that remained in their possession. Wyeth did not require that customers have a receipt in order to take advantage of the refund. Wyeth refunded approximately $705,000 to approximately 18,000 retail customers during the refund program. Wyeth’s designated corporate representative in this litigation, Dennis Markle, testified by deposition that Wyeth instituted the customer-refund program because “it was the right thing to do.”
BCBSAL sued Wyeth on September 23, 2003, alleging breach of implied contract and unjust enrichment. BCBSAL is a health-insurance company that pays, in whole or in part, the health-care costs of its insureds in exchange for premiums; BCBSAL is what is known as a third-party payer (“TPP”) of health-care services. BCBSAL also acts as an administrator for health plans of self-funded insurance groups, performing administration functions in exchange for a fee.
BCBSAL filed its first amended complaint on June 22, 2004, asserting that class treatment for all TPPs nationwide was appropriate and seeking certification of a class of all TPPs.[2] On December 17, 2004, BCBSAL filed a motion for class certification and asking to be designated the class representative for all TPPs that paid for Duract capsules that went unused following the withdrawal of the drug from the market on June 22,1998.
BCBSAL filed a second amended complaint on December 29, 2004, in which it sought recovery against Wyeth solely on a theory of unjust enrichment. BCBSAL alleged that it and other TPPs “conferred on [Wyeth] a benefit in the form of the consideration of the purchase price paid by [the putative class members] for unused Duract.” The payment for these unused capsules, BCBSAL claimed, “was erroneously made, and would not have been made if [the putative class members] had been aware that substantial portions of the Duract for which it conferred a benefit would be unused due to the withdrawal of Duract.” The complaint concluded that the “[r]etention of the benefit conferred upon [Wyeth] by [the putative class members] is inequitable and has resulted in the unjust enrichment of [Wyeth].”
After a hearing on the class-certification motion, the trial court entered an order certifying a nationwide class of TPPs “who paid for the prescription drug Duract that was not used as of the date of its withdrawal from the market on June 22, 1998, because the prescribed course of Duract for which payment was made did not expire until after its withdrawal from the market.” Any TPPs that purchased Du-ract directly from Wyeth were explicitly excluded from class membership.
Pursuant to § 6-5-642, Ala.Code 1975,[3] Wyeth filed an interlocutory appeal from the order certifying the class.

II. Standard of Review

“This Court applies an abuse-of-discretion standard of review to a trial court’s class-certification order, but we will review de novo the question whether the trial court applied the correct legal standard in reaching its decision to certify a class....
*1219 “If the [plaintiffs] fail to meet the evidentiary burden as required by Rule 23, [Ala. R. Civ. P.,] then the order certifying the ... class[ ] constitutes an abuse of discretion by the trial court.... The [plaintiffs] must establish all of the criteria set forth in Rule 23(a), Ala. R. Civ. P., and one of the criteria set forth in Rule 23(b).”
Smart Prof'l Photocopy Corp. v. Childers-Sims, 850 So.2d 1245, 1248-49 (Ala.2002) (citing Compass Bank v. Snow, 823 So.2d 667 (Ala.2001)).

III. Analysis

A. Standing

At the outset, Wyeth contends that BCBSAL lacks standing to serve as class representative because, Wyeth argues, BCBSAL did not sustain an injury of a nature required for standing. It argues that BCBSAL did not allege any loss, financial or otherwise, resulting from the withdrawal of Duract from the market, and that BCBSAL did not allege that it made payments to insureds or to pharmacies that were more than it would have made had the withdrawal not occurred. Wyeth also notes that, despite the withdrawal, BCBSAL received the same premiums from its insureds that it normally would receive in exchange for paying their health-care expenses.[4]
BCBSAL contends that Wyeth’s argument that the payments made by BCBSAL do not give BCBSAL standing actually goes to the merits of BCBSAL’s unjust-enrichment claim despite being “dressed up as if ... subject matter jurisdiction were implicated.” BCBSAL also contends that Wyeth’s argument as to standing was not presented to the trial court.[5]
BCBSAL specifically alleges that the payments made by TPPs for the purchase of Duract were “erroneously made, and would not have been made if the TPPs had been aware that substantial portions of the Duract for which it conferred a benefit would be unused due to the withdrawal of Duract.” In other words, under the particular theory of unjust enrichment urged by BCBSAL, the withdrawal of Duract from the market rendered BCBSAL’s payments, to the extent allocable to those Duract capsules that eventually went unused, an unjust benefit to Wyeth. BCBSAL’s claimed injury is its payment for unused Duract capsules.
We begin our analysis of this issue by observing that our courts too often have fallen into the trap of treating as an issue of “standing” that which is merely a failure to state a cognizable cause of action or legal theory, or a failure to satisfy the injury element of a cause of action. As the authors of Federal Practice and Procedure explain:
“The question whether the law recognizes the cause of action stated by a plaintiff is frequently transformed into inappropriate standing terms. The [United States] Supreme Court has stated succinctly that the cause-of-action question is not a question of standing.”
*1220 13A Charles Alan Wright, Arthur K. Miller, and Edward H. Cooper, Federal Practice & Procedure § 3531 (2008) (noting, however, that the United States Supreme Court, itself, has on occasion “succumbed to the temptation to mingle these questions”). The authors go on to explain:
“Standing goes to the existence of sufficient adversariness to satisfy both Article III case-or-controversy requirements and prudential concerns. In determining standing, the nature of the injury asserted is relevant to determine the existence of the required personal stake and concrete adverseness. ... The focus of the cause-of-action inquiry must not be confused with standing — it does not go to the quality or extent of the plaintiffs injury, but to the nature of the right asserted.”
13A Federal Practice & Procedure § 3531.6 (emphasis added). Cf. 13B Federal Practice & Procedure § 3531.10 (discussing citizen and taxpayer standing and explaining that “a plaintiff cannot rest on a showing that a statute is invalid, but must show ‘some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally’ ”).
In the present case, Wyeth appears to argue that the plaintiff, BCBSAL, lacks standing because, Wyeth says, BCBSAL’s allegations, even if true, would not entitle it to a recovery. In responding to a similar argument, the court in Angleton v. Pierce, 574 F.Supp. 719, 726 (D.N.J.1983), articulated a correct understanding of the aforestated difference between the issue of a plaintiffs standing and the issue of the viability of a plaintiffs cause of action:
“Associates appears to argue that plaintiffs lack standing because they have no legal right to the relief they seek. Associates has confused standing with failure to state a claim. The two are conceptually distinct: when standing is at issue, the court asks whether the plaintiffs are the proper parties to bring the action, whereas failure to state a claim focuses not on the parties but on the existence of a cause of action (i.e., on the merits). Kirby v. Department of HUD, 675 F.2d 60, 63-64 (3d Cir.1982); Bowman v. Wilson, 672 F.2d 1145, 1151 n. 10 (3d Cir.1982).”
Thus, the focus of an inquiry into standing is not on the viability of the legal theory asserted; rather, the focus is on whether the plaintiff is the “proper part[y] to bring the action.” If the legal theory itself is not a viable one under applicable law, that is a different question. The question whether the right asserted by BCBSAL is an enforceable one in the first place, i.e., whether BCBSAL has seized upon a legal theory our law accepts, is a cause-of-action issue, not a standing issue.
Thus, although questions may exist regarding the viability under Alabama law of the particular legal theory asserted by BCBSAL (see the discussion in Part III.B. of this opinion), if we assume that theory to be viable for purposes of our standing inquiry, it is easy to see that BCBSAL has “the required personal stake” to assert that theory. If BCBSAL’s legal theory is viable, i.e., if BCBSAL’s payment for unused Duract capsules resulted in the unjust enrichment of Wyeth at BCBSAL’s expense, BCBSAL’s effort to recover the funds it paid for the unused Duract reflects the “personal stake and concrete adverseness” necessary for standing.
Nor do we see that the consideration of the legal theory asserted by BCBSAL is outside the subject-matter jurisdiction of either the trial court or this Court. The courts of this State exist for the very purpose of performing such tasks as sorting out what constitutes a cognizable cause of action, what are the elements of a cause *1221 of action, and whether the allegations of a given complaint meet those elements. Such tasks lie at the core of the judicial function. See generally, e.g., Art. VI, § 139(a), Ala. Const.1901 (vesting “the judicial power of the state” in this Court and lower courts of the State); Art. VI, § 142, Ala. Const.1901 (providing that the circuit courts of this State “shall exercise general jurisdiction in all cases except as may otherwise be provided by law”). Trial courts and appellate courts routinely undertake to determine whether there is a “provable set of facts, upon [a] cognizable theory of law.” Anderson v. Clark, 775 So.2d 749, 750 (Ala.1999). See also Dawson v. Bank Independent, 602 So.2d 351 (Ala.1992); Bonner v. Henson, 693 So.2d 484, 485-86 (Ala.Civ.App.1997). The issue Wyeth seeks to frame for this Court as one of “standing” is, in reality, an issue as to the cognizability of the legal theory asserted by BCBSAL, not of BCBSAL’s standing to assert that theory or the subject-matter jurisdiction of this Court to consider it.

B. Class-Action Requirements Under Rule 23

Rule 23, Ala. R. Civ. P., states, in pertinent part:
“(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
“(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
[[Image here]]
“(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.”
“A Rule 23 determination is wholly procedural and has nothing to do with whether a plaintiff will ultimately prevail.... ” Little Caesar Enters., Inc. v. Smith, 172 F.R.D. 236, 241 (E.D.Mich.1997) (comment on Rule 23, Fed.R.Civ.P.). We also note that, in examining the several prerequisites for class certification contained in Rule 23, it should be kept in mind that “Alabama’s Rule 23 and the corresponding federal rule (Rule 23, Fed.R.Civ.P.) are ‘virtually identical,’ ... and ‘[fjederal authorities are persuasive when [a court is] interpreting the Alabama Rules of Civil Procedure.’ ” Mitchell v. H & R Block, Inc., 783 So.2d 812, 816 (Ala.2000) (quoting Marshall Durbin & Co. v. Jasper Utils. Bd., 437 So.2d 1014, 1025 (Ala.1983), and Rowan v. First Bank of Boaz, 476 So.2d 44, 46 (Ala.1985)).
“The party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met.” Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P., 247 F.R.D. 156, 164 (C.D.Cal.2007). BCBSAL *1222 seeks certification under Rule 23(b)(3), Ala. R. Civ. P. We have previously noted that “[a] number of these criteria, such as the Rule 23(a) requirements of commonality and typicality and the Rule 23(b)(3) requirement of predominance, are analytically similar.” Avis Rent A Car Sys., Inc. v. Heilman, 876 So.2d 1111, 1116 (Ala.2003) (citing Heartland Commc’ns, Inc. v. Sprint Corp., 161 F.R.D. 111, 117 (D.Kan.1995)). Wyeth questions the trial court’s conclusions with regard to predominance and superiority under Rule 23(b)(3), as well as commonality and typicality under Rule 23(a). We turn first to the trial court’s conclusion that common questions of law or fact predominate in this case.
Rule 23(b)(3) requires that “questions of law or fact common to the members of the class predominate over any questions affecting only individual members....” The trial court considered the question of predominance in response to Wyeth’s contention that claims alleging unjust enrichment generally are not suitable for class treatment. Among other things, Wyeth argued to the trial court, and argues to this Court, that the predominance requirement is not met here because prosecution of an unjust-enrichment claim will require each class member to establish that it paid for unused Duract under a mistake of fact or in reliance on a fraudulent misrepresentation.
The trial court acknowledged that this Court’s decisions provide ample support for Wyeth’s contention that unjust-enrichment claims generally are not appropriate for class certification. This Court explained in Heilman as follows:
“Because unjust-enrichment claims are fact specific to each case, this Court has repeatedly held that such claims are unsuitable for class-action treatment. Funliner of Alabama, L.L.C. v. Pickard, 873 So.2d 198, 211 (Ala.2003) (unjust-enrichment claims based on allegations of ‘mistake or fraud’ require an ‘individualized inquiry into the state of mind of each plaintiff); [Voyager Ins. Cos. v.] Whitson, 867 So.2d [1065,] 1074 [(Ala.2003) ] (unjust-enrichment claims based on an alleged ‘mistake of fact’ could not be certified for class-action treatment, because ‘[cjlass members would be required to demonstrate mistake of fact on an individual basis’); Smart Professional Photocopy Corp. v. Childers-Sims, 850 So.2d 1245, 1249 (Ala.2002) (‘proof essential to support the [class-action plaintiffs’] claims of unjust enrichment ... defeats the predominance and superiority requirements of Rule 23(b)(3)’); Reynolds Metals Co. v. Hill, [825 So.2d 100 (Ala.2002) ].”
876 So.2d at 1123.
The trial court distinguished all of these cases on the basis that they involved a mistake of fact or fraud and agreed with BCBSAL’s argument that “[a]n unjust enrichment claim need not depend on proof of mistake or fraud.” For support, the trial court cited this Court’s explanation of unjust enrichment in Heilman: “To prevail on a claim of unjust enrichment, the plaintiff must show that the ‘ “defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud.””’ Heilman, 876 So.2d at 1122-23 (quoting Dickinson v. Cosmos Broad. Co., 782 So.2d 260, 266 (Ala.2000), quoting, in turn, Hancock-Hazlett Gen. Constr. Co. v. Trane Co., 499 So.2d 1385, 1387 (Ala.1986) (some emphasis added)). From this statement in Heilman, the trial court deduced that there are two types of unjust-enrichment claims: (1) those based on the theory that “equity and good conscience” require the defendant to disgorge money that belongs to the plaintiff; and (2) those based on the theory that a “mistake [of fact] or fraud” *1223 requires the defendant to return money that belongs to the plaintiff.
The trial court concluded that BCBSAL based its theory of the case on the first type of unjust-enrichment claims, claims based on “equity and good conscience,” and that such claims are appropriate for class certification. We conclude that the trial court’s analysis asks too much of what it considers to be a separate type of unjust-enrichment claim, particularly insofar as providing a basis for the certification of a nationwide class action.[6]
Citing Mantiply v. Mantiply, 951 So.2d 638 (Ala.2006), Wyeth argues that an unjust-enrichment claim based on an allegation that the “defendant holds money which, in equity and good conscience, belongs to the plaintiff,” requires proof of mistake on the part of the plaintiff or wrongful conduct on the part of the defendant. Wyeth quotes from Mantiply as follows:
“ ‘ “The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another.” ’
“ ‘ “One is unjustly enriched if his retention of a benefit would be unjust.” ’ ... The retention of a benefit is unjust if
“ ‘ “(1) the donor of the benefit [Blue Cross] ... acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit [presumably Wyeth, although Blue Cross did not make any payment to Wyeth] ... engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been unjustly enriched.” ’ ”
*1224 Wyeth’s brief, at 42 (quoting Mantiply, 951 So.2d at 654-55 (citations omitted) (final emphasis added)). Wyeth also cites Welch v. Montgomery Eye Physicians, P.C., 891 So.2d 837, 843 (Ala.2004), and Jordan v. Mitchell, 705 So.2d 453, 458 (Ala.Civ.App.1997), as standing for the same principle. Wyeth then argues that the phrase “holds money” in the description of an unjust-enrichment claim, as stated in Heilman, refers to the “enrichment” element of “unjust enrichment” and that the phrase “in equity and good conscience” refers to the “unjust” element of “unjust enrichment.” Consistent with this Court’s statements in Mantiply and Welch, Wyeth argues that, at least under Alabama law, “in the absence of some mistake, misreliance, fraud or wrongful conduct, there may be enrichment, but not unjust enrichment.” [7]
Among other things, BCBSAL responds by asserting that Scrushy v. Tucker, 955 So.2d 988 (Ala.2006), holds that in Alabama an unjust-enrichment claim requires no proof of mistake on the part of the plaintiff or of wrongful conduct by a defendant. BCBSAL relies on the fact the parties stipulated in Scrushy that the defendant “did not participate in and is not responsible for any of the criminal activities that resulted in the falsification of the financial statements.” 955 So.2d at 1012. We are not persuaded, however, that Scrushy stands for the proposition that the prosecution of an unjust-enrichment claim does not require proof of “mistake, misreliance, fraud, or wrongful conduct.” As Wyeth points out, although the parties stipulated in Scrushy that the defendant “did not participate in the criminal fraud that resulted in the falsification of the financial statements,” the evidence showed that it was the defendant’s managerial responsibility and fiduciary duty to ensure that the financial statements were accurate and that he failed to do so. Wyeth’s reply brief, at 20. In point of fact, as Wyeth notes, the financial statements the defendant in Scrushy signed and approved were, in fact, inaccurate and unreliable, and it was in reliance on those financial statements that the bonuses at issue in Scrushy were paid.
Both the trial court and BCBSAL also rely upon Cheminova America Corp. v. Corker, 779 So.2d 1175, 1179 (Ala.2000), contending that it is an example of an Alabama unjust-enrichment case in which the court did not require proof of mistake or fraud. Wyeth correctly notes, however, that the term “unjust enrichment” appears nowhere in the Cheminova opinion; moreover, the elements of unjust enrichment are nowhere discussed in that case. Wyeth further argues that, even assuming that Cheminova could be read as involving an unjust-enrichment claim, mistaken reliance and/or wrongful conduct in that case existed in connection with the mislabeling of a consumer product that was the basis for the plaintiffs claim of entitlement to restitution. Wyeth’s reply brief, at 20 n. 8 (citing Cheminova, 779 So.2d at 1179).
Wyeth appears to have the better argument as to the requirements of Alabama law regarding unjust enrichment. Ultimately, however, we need not definitively address this question in order to determine the appropriateness of class certification of a statewide class of Alabama plain *1225 tiffs. This case is about the certification of a nationwide class. Whether Alabama law allows the packaging of an unjust-enrichment claim solely under what the trial court and BCBSAL refer to as an “equity and good conscience” type of unjust-enrichment claim is, at best from the plaintiffs perspective, a close question. There has been no adequate showing, either to the trial court or to this Court, that the laws of all (or even most of) the 49 other states would allow unjust-enrichment claims to proceed on such a basis, nor are we willing to undertake the task of parsing the law of other states in order to determine whether this is true. Further, the fact that legitimate questions exist as to the plaintiffs legal theory and that there is a need to parse the laws of 50 states to see if that theory is cognizable in all or most of those states is itself inconsistent with a finding that common questions of law predominate. As one federal court noted: “[Vjariances exist in state common laws of unjust enrichment. The actual definition of ‘unjust enrichment’ varies from state to state. Some states do not specify the misconduct necessary to proceed, while others require that the misconduct include dishonesty or fraud.” Clay v. American Tobacco Co., 188 F.R.D. 483, 501 (S.D.Ill.1999). Another federal court recently emphasized differences in the law regarding unjust enrichment among various states, including Alabama:
“Courts in Arkansas do not require a tortious, illegal or fraudulent act by the defendant to prove unjust enrichment. Frigillana v. Frigillana, 266 Ark. 296, 584 S.W.2d 30 (Ark.1979). ... In other words, Arkansas plaintiffs do not have to prove any misconduct on the part of the defendant in an unjust enrichment action.
“In contrast, Montana courts require a showing of misconduct or fault on the part of the defendant to recover under an unjust enrichment theory. ‘Unjust enrichment is an equitable doctrine wherein the plaintiff must show some element of misconduct or fault on the part of defendant, or that the defendant somehow took advantage of the plaintiff.’ Randolph V. Peterson, Inc. v. J.R. Simplot Co., 239 Mont. 1, 778 P.2d 879, 883 (Mont.1989) (citing Brown v. Thornton, 150 Mont. 150, 432 P.2d 386, 390 (Mont.1967)). See also Hayes Mechanical, Inc. v. First Industrial, L.P., 351 Ill.App.3d 1, 12, 285 Ill.Dec. 599, 812 N.E.2d 419 (Ill.App. 1st Dist.2004) (‘[Injustice involves some form of improper conduct by the party to be charged.’); National Employment Service Corp. v. Olsten Staffing Service, Inc., 145 N.H. 158, 761 A.2d 401, 406-07 (N.H.2000) (‘Because ... Olsten did not act wrongfully ..., the facts do not support a finding of unjust enrichment.’)[.]
“Alabama courts have an even higher standard for defendant’s conduct. Alabama courts require unconscionable conduct on the part of the defendant in order to make a claim for unjust enrichment. The Alabama Supreme Court concluded that the retention of a benefit is unjust if ‘(1) the donor of the benefit ... acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit ... engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been unjustly enriched.’ Mantiply v. Mantiply, 951 So.2d 638, 654-55 (Ala.2006) (quoting Welch v. Montgomery Eye Physicians, P.C., 891 So.2d 837, 843 (Ala.2004) (emphasis in original)). See also Burlington Northern R. Co. v. Southwestern Elec. *1226 Power Co., 925 S.W.2d 92, 97 (Tex.App.1996) (‘Unjust enrichment is typically found under circumstances in which one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.’); ServiceMaster of St. Cloud v. GAB Business Services, Inc., 544 N.W.2d 302, 306 (Minn.1996) (‘[I]t must be shown that a party was unjustly enriched in the sense that the term “unjustly” could mean illegally or unlawfully.’); Haggard Drilling, Inc. v. Greene, 195 Neb. 136, 236 N.W.2d 841 (Neb.1975) (fraud, misrepresentation, or other wrongful conduct required on the part of the defendant to prove unjust enrichment); DCB Const. Co., Inc. v. Central City Development Co., 965 P.2d 115, 117 (Colo.1998) (‘[F]or the enrichment to the landlord to be unjust and therefore actionable, the contractor must show some improper, deceitful, or misleading conduct by the landlord.’); Barker v. Dicicco, [No. 234443, Dec. 20, 2002] [not reported in N.W.2d] (Mich.App.2002) (‘proof of coercion or mistake to recover on unjust enrichment grounds.’); Qualichem v. Xelera, Inc., [62 Va. Cir. 179] (Va.Cir.Ct.2003)
(‘claims of unjust enrichment based on quasi-contract have been limited by the appellate courts of the Commonwealth to those arising from: money paid by mistake; failed consideration; money got through imposition; extortion; oppression; or any other undue advantage taken of the claiming party’s situation, where the advantage is contrary to laws made for the protection of persons under those circumstances.’). The misconduct element of unjust enrichment in these states is in direct conflict with the unjust enrichment law of Arkansas.”
Thompson v. Bayer Corp. (No. 4:07cv00017, Feb. 12, 2009) (E.D.Ark.2009) (not reported in F.Supp.2d) (emphasis added).
Based on the foregoing, we cannot conclude that BCBSAL has met its burden of demonstrating that common questions of law and fact predominate for purposes of Rule 23(b)(3).[8] In light of our conclusion *1227 regarding the predominance element of Rule 23(b)(3), we pretermit consideration of Wyeth’s argument regarding the “superiority” element of Rule 23(b)(3), as well as the other arguments made by Wyeth regarding the inappropriateness of class certification in this case.

TV. Conclusion

Because we conclude that BCBSAL has failed to make the necessary showing regarding the “predominance” requirement imposed by Rule 23(b)(3), Ala. R. Civ. P., we conclude that the trial court exceeded its discretion in certifying the class of TPPs of unused Duract. Therefore, we vacate the trial court’s certification order and remand the case.
ORDER VACATED AND CASE REMANDED.
COBB, C.J., and LYONS, STUART, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ., concur.
WOODALL, J., dissents.

. Wyeth used a different formula to reimburse pharmacies, distributors, and wholesalers for the capsules of Duract those entities had in their possession.

. This case was filed before the February 18, 2005, enactment of the Class Action Fairness Act, 28 U.S.C. § 1332(d), which is one reason this Court has jurisdiction to address the class-certification issues presented here.

. Section 6-5-642 provides, in pertinent part: “A court's order certifying a class or refusing to certify a class action shall be appealable in the same manner as a final order to the appellate court which would otherwise have jurisdiction over the appeal from a final order in the action.”

. Wyeth also contends that it does not ''hold” any money related to the sales of unused Duract capsules because it refunded the value of the capsules (plus an incentive amount) to retail customers and because it credited pharmacies and wholesalers for all Duract capsules they returned. Similarly, it contends that it does not "hold” any money from TPPs related to Duract sales because the TPPs never paid Wyeth directly; the TPPs paid the pharmacies or their insureds.

. Because standing does implicate subject-matter jurisdiction, we address it before considering whether BCBSAL has demonstrated the elements necessary for class certification under Rule 23, Ala. R. Civ. P.

. As discussed in Part III.A., supra, the questions concerning the viability of BCBSAL's asserted cause of action and BCBSAL’s standing to present that cause of action to a court are two separate questions. What the elements of that cause of action are, however, and the commonality of those elements under Alabama law and the law of the 49 other states must be considered in relation to the requirement of predominance in Rule 23(b)(3). In Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), the United States Supreme Court, construing Rule 23, Fed.R.Civ.P., held that a trial court cannot “conduct a preliminary inquiry into the merits of a suit" and observed, "[w]e find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.” Later, however, in General Telephone Co. v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), the Court stated that the certification required a “rigorous analysis” and noted that " ‘the class determination generally involves considerations that are "enmeshed in the factual and legal issues comprising the plaintiff's cause of action.” ' " (Quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978).) Lower federal courts have since wrestled with this potentially conflicting dichotomy. The United States Court of Appeals for the Second Circuit in In re Initial Public Offering Securities Litigation, 471 F.3d 24, 33 (2d Cir.2006), limited Eisen as follows: “The oft-quoted statement from Eisen [condemning inquiry into the merits] was made in a case in which the district judge’s merits inquiry had nothing to do with determining the requirements for class certification.” The IPO court, after reviewing precedent from other circuits, concluded:
“With Eisen properly understood to preclude consideration of the merits only when a merits issue is unrelated to a Rule 23 requirement, there is no reason to lessen a district court’s obligation to make a determination that evety Rule 23 requirement is met before certifying a class just because of some or even full overlap of that requirement with a merits issue.”
471 F.3d at 41. The IPO court’s analysis appears to be a reasonable reading of the limits of Eisen.

. See also 42 C.J.S. Implied Contracts § 9 (2007) (citing Mantiply v. Mantiply, 951 So.2d 638 (Ala.2006)):
"The retention of a benefit is 'unjust,' for purposes of an unjust enrichment claim, if the donor of the benefit acted under a mistake of fact or in misreliance on a right or duty, or the recipient of the benefit engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship.”

. BCBSAL also relies upon the decision in In re Pennsylvania Baycol Third-Party Payor Litigation (No. 1874, April 4, 2005) (Pa.Com.Pl.) (not reported in A.2d), and, in particular, the following statement in that decision:
"All state laws commonly find unjust enrichment when a defendant wrongfully retains the money received from the sale when the defendant thereafter advises the consumer not to use the product because it may be unsafe. Essentially, the law everywhere requires proof that the defendant has kept what a plaintiff paid for a product under circumstances in which retention is inequitable."
We note, however, that Baycol is a decision rendered by a Pennsylvania trial court, one not tested by a Pennsylvania appellate court. Moreover, the Pennsylvania trial court does not include in its opinion any discussion of what is required for a retention of money to be "wrongful" or "inequitable.” It therefore provides no persuasive analysis for the proposition that an "unjust enrichment" can occur other than under the circumstances explained in Mantiply.
In the present case, Duract was not "unsafe” if used in accordance with the manufacturer’s instructions and limitations. One cannot discern from the trial court's opinion in Baycol whether the same could be said of the drug at issue there; all we are told is that the defendants advised the consumer "not to use the product because it may be unsafe.”
In addition, Baycol was designed for long-term use in treating chronic high cholesterol and was a drug patients must take daily, regardless of the present or absence of subjective symptoms. Part of the reasoning of the court in Baycol was that the discontinuance of the drug would require TPPs to incur the expense of substitute medications for their insureds and the expense of certain medical monitoring that would be required during the process of switching to a different chronic-use medication. In contrast, Duract is intended for temporary use, no more than 10 days, for the temporary management of acute pain, and it may be discontinued as *1227 symptoms permit. There is no claim in any version of BCBSAL’s complaint or in the evidence presented for damages for the cost of “replacement” drugs or the cost of any medical monitoring associated with the switch to a different drug.