MAIN, Justice.
The Gardens at Glenlakes Property Owners Association, Inc., Lake View Villas Association, Inc., Lake View Estates Property .Owners Association, Inc., Glenlakes Unit One Property Owners Association, Inc., and Glenlakes Master Association, Iric. (“the Associations”), and Glenlakes Golf Club, Inc. (“the Golf Club”), appeal a judgment entered against them and in favor of, Baldwin County Sewer Service, LLC (“BOSS”), by' the Baldwin Circuit Court. For the reasons stated below, we reverse and remand.
I. Facts and Procedural History
In 1985, South. Alabama Sewer Service, Inc. (“SASS”), and Lake View Developers, *49 Ltd. (“Lake View”),[1] entered into an agreement pursuant to which SASS was to construct a sewer line from its waste-treatment facility to a new planned subdivision and golf course in Baldwin County, known as Lake View Estates, that was being developed by Lake View. In 1987, Lake View and SASS entered into an agreement by which SASS agreed to accept waste' water from Lake View Estates for treatment. Lake View agreed that, for each lot it sold in the first two phases of the development of Lake View Estates, it would purchase a sewer tap from SASS at a specified cost and pass the cost of the tap on to each purchaser. In return, SASS agreed that it Would provide sewer service to Lake View Estates and charge “regular monthly service rates to all users within Lakeview Estates that it charges to similar customers.”
In 1989, Lake View filed for bankruptcy. The development and golf course, excluding lots that had already been sold, were placed in receivership. On November 8, 1991, the development and golf course were purchased by Lakeview Realty Co. (“Lakeview Realty”).
. On November 13,1991, SASS and Lake-view Realty entered • into a new sewer agreement (“the 1991 agreement”). The 1991 agreement provided, in part:
“RECITALS
“A. [Lakeview Realty] has entered into a contract to purchase from the Resolution Trust Corporation, as Receiver for Alamo Federal Association of Texas, a subdivision in Baldwin County, Alabama known as Lakeview Estates consisting of a golf course, approximately 180 developed lots, and vacant land for future development (‘Lakeview Estates’). .
“B. [SASS] has constructed- a sewer line from its waste treatment facility to Lakeview Estates, and certain inner service sewer lines within the subdivision serving the developed lots have been installed,
■ “C. The parties desire to set out herein their agreement whereby future purchasers of the lots in Lakeview Estates will purchase sewer taps from [SASS] and [SASS] will furnish sewer service to such owners of lots in Lakeview Estates.
“NOW,- THEREFORE, in consideration of the premises and mutual covenants contained herein, the parties do agree as follows:
“1. Sewer Taps and Services. [SASS] agrees to furnish sewer taps and sewer service to all lots in Lakeview Estates, both those lots now developed and all lots developed in the future. [Lakeview Realty] agrees to include a provision in its real estate sales contracts requiring that all purchasers of its lots in Lake-view Estates purchase sewer taps exclusively from [SASS] upon the terms and conditions contained in this Agreement.
[[Image here]]
“4. Inner Service Sewer Lines. Upon the sale and closing of the within described property from the Resolution Trust Corporation to [Lakeview Realty], all inner service sewer lines in Phase I shall be conveyed to [SASS] free and clear of all liens. .Upon the completion, inspection and acceptance by [SASS] of all inner service [sewer lines] in each future development phase of Lakeview Estates, [Lakeview Realty] shall promptly convey by appropriate legal *50 instrument all of the inner service sewer lines within such phase to [SASS] free and clear of all liens.
“5. Waste Water. [SASS] agrees to accept waste water from Lakeview Estates for treatment at its waste treatment facility for all lots with respect to which sewer tap fees and monthly service fees have been paid to [SASS]. [SASS] shall charge regular- monthly sewer serve rates to all users within Lakeview Estates that are competitive with charges made by others for similar services in the South Baldwin County vicinity. The charges for customers in Lakeview Estates shall not be more than charges for all other customers of the same class or type.”
The 1991 agreement further purported to cancel and to replace all prior agreements involving SASS related to Lake View Estates, including the 1987 agreement between SASS and Lake View, and stated that “[t]his agreement shall be construed as a covenant running with the land.”[2] The 1991 agreement was recorded in the Baldwin County probate office. The 1991 agreement did not include a legal description of the property comprising “Lake View Estates.”
In July 2003, BCSS put'chased from SASS the sewer lines and sewer facilities servicing Lake View Estates. In 2004, BCSS purchased all the stock of SASS. Subsequent to BCSS’s purchase of SASS and its facilities in Baldwin County, all monthly sewer fees related to Lake View Estates have been billed by and paid to BCSS.
Sometime following its acquisition of SASS’s sewer system, BCSS enacted a rate increase affecting customers in Lake View Estates. In 2014, the Associations, whose members are property owners in Lake View Estates, sued BCSS in the Baldwin Circuit Court, generally asserting that BCSS had violated the sewer-service-rate provision of the 1991 agreement. The Associations contend that the rate increase effected by BCSS resulted in a rate that exceeded the rate permitted by the 1991 agreement. The Associations asserted claims of breach of contract, conversion, “willfully violating] the terms” of the 1991 agreement, deprivation of owner in possession, and theft of property by deception and sought a declaratory judgment and specific performance of the 1991 agreement. The Golf Club and the City of Foley, who owns property in Lake View Estates, were granted permission to intervene in the lawsuit, with each also seeking to enforce the 1991 agreement. The Golf Club’s complaint in intervention asserted claims of breach of contract and also sought a declaratory judgment and specific performance against BCSS. The City of Foley sought declaratory relief.[3]
On June 1, 2015, the Associations and the Golf Club filed a joint motion for a partial summary judgment on their request for a declaratory judgment. On July 9, 2015, BCSS filed a cross-motion for a summary judgment on the declaratory-judgment issue. BCSS argued that the Associations and the Golf Club lacked standing to enforce the 1991 agreement on behalf of the individual property owners and that the 1991 agreement was unenforceable because it was, BCSS argued, “ambiguous on its face.” On September 23, 2015, the trial court entered a summary judgment in favor of BCSS and denied the Associations and Golf Club’s motion for a summary judgment. The court concluded *51 that the Associations and the Golf Club lacked standing to enforce the 1991 agreement and that, even if they had standing, the 1991 agreement was unenforceable because it is “vague and ambiguous” concerning the specific property to which it applies and the rate allowed to be charged customers in Lake View Estates. In light of its ruling, the trial court ordered the parties to show cause why all remaining claims should not be dismissed. The Associations and the Golf Club conceded that, given the trial court’s ruling concerning the enforceability of the 1991 agreement, all remaining claims were untenable. On October 20, 2015, the trial court entered a final judgment dismissing all remaining claims. The Associations and the Golf Club appealed.
II. Standard of Review
“We review a summary judgment de novo. Potter v. First Real Estate Co., 844 So.2d 540, 545 (Ala.2002) (citing American Liberty Ins. Co. v. AmSouth Bank, 825 So.2d 786 (Ala.2002)).
“ ‘ “We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. ‘Substantial evidence’ is ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw.” ’ “844 So.2d at 545 (quoting Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C., 792 So.2d 369, 372 (Ala.2000)) (citations omitted).
“Summary judgment is appropriate only when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P.”
Hooper v. Columbus Reg'l Healthcare Sys., Inc., 956 So.2d 1135, 1139 (Ala.2006).
III. Analysis
The Associations and the Golf Club argue that the trial court erred in concluding that they lacked standing and that, in any event, the 1991 agreement was unenforceable. We agree.
We first address the trial court’s conclusion that the Associations and the Golf Club lacked standing to assert claims based on the 1991 agreement. Specifically, the trial court concluded that because the Associations were “not the owners of any interest in the property made the subject of the ’91 Sewer Agreement ... the [Associations] do not have standing to assert property damage claims on behalf of individual owners ... [or] standing to seek enforcement of the ’91 Sewer Agreement.” It is unclear whether the trial court intended to include the Golf Club in its standing analysis. Nevertheless, on appeal BCSS argues that the Golf Club likewise lacks standing because, as it was an existing sewer customer before the execution of the 1991 agreement, the 1991 agreement did not apply to it. Whatever the merits of BCSS’s argument that the Associations may not enforce claims of the individual owners or that the 1991 agreement does not apply to the Golf Club, it is clear that these are not issues of “standing.”
The concept of standing implicates a court’s subject-matter jurisdiction. See *52 State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1028 (Ala.1999) (“When a party without standing purports to commence an action, the trial court acquires no subject-matter jurisdiction.”). As Justice Lyons wrote in Hamm v. Norfolk Southern Ry., 52 So.3d 484, 499 (Ala.2010) (Lyons, J., concurring specially): “Imprecision in labeling a party’s inability to proceed as a standing problem unnecessarily expands the universe of cases lacking in subject-matter jurisdiction.” In Wyeth, Inc. v. Blue Cross & Blue Shield of Alabama, 42 So.3d 1216 (Ala.2010), this Court noted:
“[Olur courts too often have fallen into the trap of treating as an issue of ‘standing’ that which is merely a failure to state a cognizable cause of action or legal theory, or a failure to satisfy the injury element of a cause of action. As the authors of Federal'Practice and Procedure explain:
“ ‘The question whether the law recognizes the cause of action stated by a plaintiff is frequently transformed into inappropriate standing terins. The [United States] Supreme Court has stated succinctly that the cause-of-action question is not a question of standing.’
“13A Charles Alan Wright, Arthur K. Miller, and Edward H. Cooper, Federal Practice & Procedure § 3531 (2008) (noting, however, that the United States Supreme Court, itself, has on occasion ‘succumbed to the temptation to mingle these questions’). The authors go on to explain:
“ ‘Standing goes to thé existence of sufficient adversariness to satisfy both Article III case-or-controversy requirements and prudential concerns. In determining standing, the nature of the injury asserted is relevant to determine the existence of the required personal stake and concrete adverseness. ..-
“13A Federal Practice & ' Procedure § 3531.6 .... Cf. 13B Federal Practice & Procedure § 3531.10 (discussing citizen and taxpayer standing and explaining that ‘a plaintiff cannot rest on a showing that a statute is invalid, but must show “some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally” ’). •
• “In the present case, Wyeth appears to argue that the plaintiff, BCBSAL, lacks standing because, Wyeth says, 'BCBSAL’s allegations, even' if true, would not entitle it to a recovery. ...
“... The question whether the right asserted by BCBSAL is an enforceable one in the first place, i.e., whether BCBSAL has seized upon a legal theory our law accepts, is a cause-ofraction issue, not a standing issue.
[[Image here]]
“Nor do we see that the consideration of. the legal theory asserted by BCBSAL is outside the subject-matter jurisdiction of either the trial court or this Court. The courts of this State exist for the very purpose of performing such tasks as sorting out what constitutes a cognizable cause of action, what are the elements of a cause of action, and whether the allegations of a given complaint meet those elements. Such tasks lie at the core of the judicial function. See generally, e.g., Art. VI, § 139(a), Ala. Const. 1901 (vesting ‘the judicial power of the state’ in this Court and lower courts of the State); Art. VI, § 142, Ala. Const. 1901 (providing that the circuit courts of this State ‘shall exercise general jurisdiction in all cases except as may otherwise be provided by law’).... The issue Wyeth seeks to frame for this Court as one of ‘standing’ is, in reality, an issue as *53 to the cognizability of the legal theory asserted by BCBSAL, not of BCBSAL’s standing to assert that theory or the subject-matter jurisdiction of this Court to consider it.”
42 So.3d at 1219-21 (some emphasis added; some emphasis omitted).
Recently, in Ex parte BAC Home Loans Servicing, LP, 159 So.3d 31 (Ala.2013), this Court again examined the concept of standing and cautioned that the concept is generally relevant only in public-law cases. 159 So.3d at 44-45. In BAC we quoted Professor Hoffman:
“ ‘[T]he word “standing” unnecessarily invoked in the proposition can be erroneously equated with “real party in interest” or “failure to state a claim.” This simple, though doctrinally unjustified, extension could swallow up Rule 12(b)(6), Rule 17[, Ala. R. Civ. P.,] and the whole law of amendments.’ ”
159 So.3d at 46 (quoting Hoffman, The Malignant Mystique of “Standing,” 73 Ala. Law. 360, 362 (2012)).
In this case, the question whether the Associations may properly assert the claims of their individual members is, in fact, a real-party-in-interest inquiry. This question is distinct from the question of standing: It does not implicate the subject-matter jurisdiction of the trial court, and the trial court can address' the issue, if properly raised, by applying Rule 17(a), Ala. R. Civ. P. See Property at 2018 Rainbow Drive, 740 So.2d at 1027 (“‘“[T]he real party in interest principle is a means to identify the person who possesses the right sought to be enforced.”’” (quoting Dennis v. Magic City Dodge, Inc., 524 So.2d 616, 618 (Ala.1988), quoting in turn 6 C. Wright & A. Miller, Federal Practice & Procedure § 1542 (1971))). Likewise, if, as BCSS argues, the 1991 agreement does not govern sewer rates charged to the Golf Club, then the Golf Club simply will not be entitled to relief under that contract. As we concluded in BAC:
“If in the end the facts do not support the plaintiffs, or the law does not do so, so be it — but this does not mean the plaintiffs cannot come into court and allege, and attempt to prove, otherwise. If they fail in this endeavor, it is not that they have a ‘standing’ problem; it is, as Judge Pittman recognized in Sturdivant [v. BAC Home Servicing, LP, 159 So.3d 15 (Ala.Civ.App.2011),] that they have a ‘cause of action’ problem, or more precisely in these cases, a ‘failure to prove one’s cause of action’ problem. The trial court has subject-matter jurisdiction to ‘hear’ such ‘problems’ — and the cases in which they arise.” .
159 So.3d at 46. The Associations and the Golf Club in this case may have a “cause of action” problem; they may have a “real-party-in-interest” problem — we do not, of course, mean to suggest an answer.[4] There is, howevér, no “standing” problem. Accordingly, the trial court erred in entering a summary judgment based on the Associations’ and the Golf Club’s purported lack of standing.
The trial court also stated as an alternate ground for the summary' judgment that the 1991 agreement was unenforceable because of fatal ambiguities and indefiniteness of material terms of the agreement. It held, first, that the scope of the property covered by the 1991 agreement was not sufficiently described and, second, that the meaning of the phrase requiring that the sewer rates charged be “competitive with charges made by others for similar services” was incapable of determination. Accordingly, the trial court *54 concluded it could not enforce the 1991 agreement.
“ ‘To be enforceable, the [essential] terms of a contract must be sufficiently definite and certain, Brooks v. Hackney, 829 N.C. 166, 170, 404 S.E.2d 854, 857 (1991), and a contract that “%av[es] material portions open .for future agreement is nugatory and void for indefiniteness’ ” .... ’ Miller v. Rose, 188 N.C.App. 582, 587-88, 532 S.E.2d 228, 232 (2000) (quoting MCB Ltd. v. McGowan, 86 N.C.App. 607, 609, 359 S.E.2d 50, 51 (1987), quoting in turn Boyce v. McMahan, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974)). ‘A lack of definiteness in an agreement may concern the time of performance, the price to be paid, work to be done, property to be transferred, or miscellaneous stipulations in the agreement.’ 1 Richard A. Lord, Williston on Contracts § 4:21, at 644 (4th ed. 2007). ‘In particular, a reservation in either party of a future unbridled right to determine the nature of the performance ... has often caused a promise to be too indefinite for enforcement.’ Id. at 644-48 (emphasis added). See also Smith v. Chickamauga Cedar Co., 263 Ala. 245, 248-49, 82 So.2d 200, 202 (1955) (‘“A reservation to either party to a contract of an unlimited right to determine the nature and extent of his performance, renders his obligation too indefinite for legal enforcement.’”) (quoting 12 Am. Jur. Contracts § 66). Cf. Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1440 (7th Cir.1992) (an indefinite term may ‘render[ ] a contract void for lack of mutuality’ of obligation).
“ ‘Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.’ 17A Am. Jur. 2d Contracts § 183 (2004). ‘The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.’ Id. (emphasis added). See also Smith, 263 Ala. at 249, 82 So.2d at 203.”
White Sands Group, L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1051 (Ala.2008).
“Generally speaking, our courts have not favored the destruction of contracts on the grounds that they are ambiguous, uncertain, or incomplete, see Alabama National Life Insurance Co. v. National Union Life Insurance Co., 275 Ala. 28, 151 So.2d 762 (1963); Smith v. Chickamauga Cedar Co., 263 Ala. 245, 82 So.2d 200 (1955), and ‘will, if feasible, so construe a contract as to carry into effect the reasonable intention of the [contracting] parties if that can be ascertained.’ McIntyre Lumber & Export Co. v. Jackson Lumber Co., 165 Ala. 268, 51 So. 767 (1910). Nevertheless, a trial court should not attempt to enforce a contract whose terms are so indefinite, uncertain, and incomplete that the reasonable intentions of the contracting parties cannot be fairly and reasonably distilled from them. Alabama National Life Insurance Co. v. National Union Life Insurance Co., supra .... ”
Cook v. Brown, 393 So.2d 1016, 1018 (Ala. Civ.App.1981).
In this case, the 1991 agreement generally provided that Lakeview Realty would ensure that all lots sold in Lake View Estates would require purchase of sewer taps tied into SASS’s sewer lines. In return, SASS agreed to provide sewer service to Lake View Estates. The purpose of the 1991 agreement is clear. The developers of Lake View Estates needed sewer service to the subdivision, and SASS wanted to justify its construction of a sewer line to Lake View Estates by ensuring that all property owners in Lake View Estates *55 would be SASS customers. The 1991 agreement did not set the specific rates to be charged customers in Lake View Estates, but it did provide that SASS would charge sewer-service rates to “all users within Lake View Estates that are competitive with charges made by others for similar services in the South Baldwin County vicinity.” It is this provision that the Associations and the Golf Club now seek to enforce.
With regard to the property covered by the 1991 agreement, the trial court held that the 1991 agreement was unenforceable because “[t]he property subject to the ’91 Sewer Agreement is not sufficiently described as there is no legal description stated therein.” We disagree that the lack of a metes-and-bounds legal description within the four corners of the 1991 agreement makes the terms of the 1991 agreement fatally uncertain. It is clear that the parties to the 1991 agreement understood its geographic scope: “Lake View Estates.” There appears to be no dispute regarding the boundaries of Lake View Estates, and, to the extent there is, the record contains the legal description of the development and also includes references to plats and other descriptive documents. The geographic scope of the 1991 agreement is, therefore, decidedly not indefinite.
The phrase at the center of the dispute, however, is more problematic. SASS agreed that it would charge sewer rates “competitive with charges made by others for similar services in the South Baldwin County vicinity.” The parties have cited no cases interpreting similar language, but the phrase is analogous to phrases such as “fair market value” or “reasonable price,” which have been uniformly held to be sufficiently definite for enforcement. See, e.g., H.C. Schmieding Produce Co. v. Cagle, 529 So.2d 243, 248 (Ala.1988) (“market price”); Schade v. Diethrich, 158 Ariz. 1, 760 P.2d 1050 (1988) (“fair and equitable”); Northrup v. Hushard, 129 A.D.2d 1005, 514 N.Y.S.2d 304 (1987) (“reasonable market value price”); Coodwest Rubber Corp. v. Munoz, 170 Cal.App.3d 919, 921, 216 Cal.Rptr. 604, 605 (1985) (“fair market value”); Miller v. Bloomberg, 26 Ill.App.3d 18, 324 N.E.2d 207 (1975) (“then prevailing market price”); Mose Cohen & Sons, Inc. v. Kuhr, 13 O.O.2d 453, 85 Ohio L. Abs. 302, 171 N.E.2d 207, 213 (C.P.1959), decree aff'd by, 13 Ohio Op.2d 460, 171 N.E.2d 216 (Ct.App.1960) (“fair market value of said materials then prevailing in the Cincinnati market”); Edwards v. Tobin, 132 Or. 38, 284 P. 562 (1930) (“reasonable rental under the then existing conditions”); and 1 Joseph M. Perillo, Corbin on Contracts § 4.3, 572 (rev. ed. 1993) (“At times the agreement is explicit that a reasonable price will be agreed upon. In such cases all should agree that the agreement is sufficiently definite.”). We therefore find that the phrase at issue in this case is sufficiently definite and capable of judicial construction. Accordingly, the trial court erred in concluding that the 1991 agreement was unenforceable based on a fatal indefiniteness.
IV. Conclusion
In this case, whether the Associations or the Golf Club has the right to enforce the 1991 agreement is not a question of standing implicating the subject-matter jurisdiction of the Baldwin Circuit Court. Accordingly, the trial court erred in entering a summary judgment on the ground that the Associations and the Golf Club were without standing. Moreover, to the extent that the Associations and the Golf Club are the proper parties to pursue such an action, the terms of the 1991 agreement are not so indefinite as to render the 1991 agreement *56 unenforceable. Therefore, we reverse the judgment of the Baldwin Circuit Court and remand the cause for further consideration consistent with this opinion. : ■
REVERSED AND REMANDED.
Bolin, Shaw, and Bryan, JJ., concur.
Murdock, J., concurs in the result.

. “Lake View” is spelled in the record both as two words and as one word — "Lakeview.” We have made an effort to determine the correct spelling for the various entities and used it accordingly. We have not changed the spelling in the documents we quote from the record.

. The issue whether this language effectively created a restrictive covenant is not before this Court.

. The City of Foley is not a party to this appeal.

. Nor do we express any- opinion as to whether the Associations, the Golf Club, or any individual homeowner in Lake View Estates has ,a right to enforce the 1991 agreement.